# ARGUED AND DETERMINED

## IN THE

# SUPREME COURT OF MISSISSIPPI

### AT THE

## MARCH TERM, 1916.

---

### RESTER v. STATE.

[70 South. 881]

1. HOMICIDE. *Instructions. Manslaughter. Evidence. Verdict. Appeal. Harmless error. Condition of weapon.*

    Where on a trial for murder, the evidence for the state, if believed convicted the defendant of murder, if anything, and the evidence of the defendant, if believed, established a clear case of self-defense, it was error for the court to grant the state an instruction authorizing a verdict of manslaughter.

2. HOMICIDE. *Verdict. Manslaughter. Evidence.*

    In such a case a verdict of manslaughter pursuant to such instructions, not being supported by the evidence, was error.

3. SAME.

    In such case such instructions on manslaughter was not rendered harmless, because the verdict of manslaughter was favorable to accused.

4. HOMICIDE. *Instructions. Manslaughter.*

    Where in a trial for murder the evidence for the state, if believed, convicted the defendant of murder, and the evidence for the defendant, if believed, established a clear case of self-defense, defendant was entitled to an instruction telling the jury expressly that they must either convict the defendant of murder or acquit.

5. HOMICIDE. *Evidence. Condition of weapon.*

    In a trial for murder it was not error for the court to permit a witness for the state to testify that the rifle of deceased was on safety though several hours had elapsed since the shooting, when

the evidence disclosed that all parties left the scene of the homi-
cide immediately after the shooting, without disturbing the body
of deceased, and there was nothing in the evidence to indicate
that any one approached the body of the deceased for examina-
tion or other purpose before the sheriff's posse arrived.

APPEAL from the circuit court of Pearl River county.
HON. N. E. WEATHERSBY, Judge.
Tom Rester was convicted of manslaughter and appeals.
The facts are fully stated in the opinion of the court.

*Parker & Shivers,* for appellant.

*Lamar F. Easterling,* Assistant Attorney-General, for
the state.

STEVENS, J., delivered the opinion of the court.

Appellant, together with one Roy Davis, was indicted
by the circuit court of Pearl River county for the murder
of one Sol Ladner, tried and convicted of manslaughter.
The homicide occurred August 28, 1914, on the public
highway near the east end of a little bridge across "Alli-
gator creek" seven or eight miles east of the town of Pop-
larville. It appears that on the day of the difficulty the
deceased, in company with his relatives, R. Ladner and
Aaron Ladner, had been fishing on Alligator creek from
about eight o'clock in the morning to somewhere between
twelve and one o'clock; the deceased being engaged in
shooting fish on this occasion by the use of what is termed
a high-pressure rifle that projects with great force a steel
bullet, and his associates using the hook and line. The de-
ceased had spent the preceding night with his uncle, R.
Ladner, the principal state witness in this case, and this
fishing party took with them that morning a quart of al-
cohol which they diluted to some extent with water and
sugar, and which they drank freely during the forenoon.
Appellant on the morning of the difficulty left his home
in Poplarville, as he says, to go to the home of one Tom
Lee to consummate a deal for a pair of mules. Appellant

took with him an automatic shotgun, and when in about
a mile of the scene of the homicide he met with one Leroy
Davis, who accompanied appellant on his journey. It is
appellant's contention that he left his mule at the home
of George Davis at the suggestion of Leroy and pro-
ceeded on foot in company with Leroy Davis in order
that they might hunt turkeys as they went and came.

Bad blood existed between appellant and the deceased,
and it appears that threats had been freely uttered by the
deceased and communicated to appellant for a long time
before the killing. This bitter feeling had existed to the
extent that about a month prior to the killing the deceased,
armed with a shotgun, waylaid appellant by stationing
himself in a thick clump of what is known as gallberry
bushes; but his presence and position were discovered by
appellant, who, being also armed, threw his gun upon
the deceased, and under the startling circumstances of this
near tragedy discussed his trouble with deceased, and told
him that, if he (deceased) would promise to go about his
business and make no further demonstration and attempt
to take the life of appellant, he (appellant) would not kill
him or give him any trouble. There is evidence, however,
that after both departed they gave conflicting versions of
this near tragedy, some of the witnesses testifying that de-
ceased stated the only reason he did not kill appellant on
this occasion was that appellant was too quick for him,
and other witnesses for the state testifying that appellant
reported that the only reason he did not kill deceased
was that his gun was tricky, and he was afraid to risk it.
There is no evidence that appellant knew that the de-
ceased was fishing on this creek the day of the homicide or
that he expected to encounter the deceased on that occa-
sion. The main state witness, R. Ladner, was a cousin
of the deceased, the father-in-law of appellant, also dis-
tantly related by blood to appellant. One witness testi-
fies that the deceased, familiarly referred to as "Uncle
Sol," sought to induce one John Ladner to kill appellant
together with one Davis. It appears further that the

younger Ladner, Aaron, who carried the wallet containing the fiery refreshment, was so badly intoxicated at the time of the shooting that he could not be used as a witness in this case. At the point where the bridge crosses Alligator creek, the creek runs north and south, and the public highway east and west. The fishing party had been up the creek that morning, and in returning, according to the testimony for the state, the two Ladners arrived at the bridge in advance of the deceased, and found appellant and his companion standing together at the east end of the bridge. The evidence is conflicting, however, on this point; appellant testifying that the two Ladners were already at the bridge when he and Mr. Davis arrived that far on their journey. R. Ladner, appellant, and Leroy Davis were engaged in conversation, when, according to the testimony of the only state witness attempting to detail the facts, appellant threw his gun quickly to his shoulder and fired five times as rapidly as he could shoot his automatic shotgun, which carries its cartridges in a a magazine and expels the empty shells as it shoots. R. Ladner says, when appellant began firing, he was standing facing south and therefore had his back turned toward the direction in which appellant shot. He says he turned his head, however, and looked up the creek and saw the deceased sinking to the ground about twenty-six steps north and east of the creek; that immediately after appellant fired the five shots his companion, Roy Davis, took cover under a pine tree standing between him and the deceased and fired once upon the deceased, exclaiming at the same time, "I got him," or words to that effect; that thereupon the witness heard appellant working his gun, and he turned and saw appellant advancing several steps toward the deceased and fire twice more; that at that time deceased was prostrate and dying. This witness did not see the deceased at all at the time appellant commenced firing. The exact testimony on this point is as follows:

"Q. And you could not see behind you, of course? A. No, sir. Q. And you could not tell who was behind you,

and therefore you could not see Mr. Ladner? A. No, sir. Q. And you did not see him? A. No, sir.''

This witness admits he had been drinking, but denies being drunk. There is some testimony to the effect that he was intoxicated several hours after the homicide.

Appellant took the witness stand in his own behalf; disclaimed any knowledge that he expected to meet the deceased on that day, denied being armed for the purpose of killing the deceased, claimed he and his companion were on a lawful journey to transact business and hunt turkeys, and contradicted some of the material statements of the state witness as to what happened at the time of the fatal encounter. He says he was sitting on the east side of the creek on a grassy knoll facing west when he suddenly beheld the deceased coming through the woods down the creek with his high power rifle, and that deceased, on seeing appellant, threw his rifle from his shoulder in a shooting position, when he (appellant) threw his shotgun to his left shoulder and began firing rapidly. His testimony, if believed, makes out a clear case of self-defense.

There was testimony on the part of the state from the sheriff and his deputy that they went to the scene of the homicide some four or five hours after the killing and found deceased lying with his head down the creek, his right hand near the trigger guard of his rifle, his left arm just to the left of the barrel, but the rifle was on safety. The defense objected to the statement of the sheriff that the rifle was on safety, for the reason that too great time had elapsed between the time of the shooting and the time the sheriff's posse arrived. This testimony was admitted over the objection of appellant. There is no testimony that the deceased ever fired his rifle.

Appellant attempts to justify the charge of the state witness that he fired upon the deceased after he was prostrate and dying by testifying that after the deceased fell to the ground he raised up on his knees, attempting to get his gun into action, and there is evidence to the effect

that some of the shot entering the chest of the deceased ranged or slanted downward. There is evidence that the back of the left hand and arm of the deceased was literally filled with shot, and the defense contends that these shot could not have entered the back of the hand and arm and in the pit of the arm unless the deceased had his gun in a shooting position, attempting to shoot from the right shoulder, as he was accustomed to do. All of the shot struck the deceased on the left side of his head and chest. Most of these shot were small shot, but a few of them were what is known as buckshot.

On the trial of the case the court, at the request of the district attorney, gave two instructions in reference to the charge of murder, and in addition gave the following instruction as to the verdicts it might return, to wit:

"First: 'We, the jury, find the defendant guilty as charged in the indictment.' In which event it will become the duty of the court to pronounce the death sentence against the defendant.

"Second: 'We, the jury, find the defendant guilty as charged in the indictment, and certify that we are unable to agree as to his punishment.' In which event it will become the duty of the court to sentence the defendant to the state penitentiary for his natural life.

"Third: 'We, the jury, find the defendant guilty as charged in the indictment, and fix his punishment at imprisonment in the state penitentiary for his natural life.' In which event it will become the duty of the court to sentence the defendant to the state penitentiary for his natural life.

"Fourth: 'We, the jury, find the defendant guilty of manslaughter.'

"Fifth: 'We, the jury, find the defendant not guilty.' "

The defendant asked no instruction with reference to manslaughter, but earnestly complains at the action of the trial court in granting the state the instruction authorizing the jury to return a verdict of manslaughter, and

complains of the verdict rendered in pursuance of this instruction.

The state's evidence, if believed, convicts the defendant of the crime of murder, if anything. The defendant's testimony, if believed, establishes a clear and unquestioned case of self-defense. As said by our court in similar cases, there is no middle ground. This is not a case where the jury, by believing certain portions of the state's evidence and certain portions of the defendant's evidence, can thereby weave out or make a case of manslaughter. This is a typical case where the defendant is guilty of unprovoked murder or he is innocent. It is the province of the jury to pass upon the facts of a case and to believe parts of the evidence of either side and discard any portion of the evidence either for the state or for the defendant. It is certainly the province of the jury also to settle any issue of fact in the case, but the defendant has the absolute right to have the facts of the case presented to the jury on instructions which state the law fully and accurately. The jury must apply the facts to the particular case in the light of, and in accordance with, the law of the case. If there is no element of manslaughter under the facts of the case, then there should be no instruction granted either to the state or to the defendant in reference to manslaughter. In the present case the defendant asked for no instruction on manslaughter, and the action of the court in authorizing the jury to return a verdict of manslaughter was error.

The verdict of the jury rendered in pursuance of this instruction and convicting the defendant of the crime of manslaughter is not supported by the evidence in the case and constitutes error.

It is contended, however, that even though the granting of this instruction is error, it is harmless error; that the verdict of the jury is favorable to the defendant, and under the ruling of this court in *Huston* v. *State,* 105 Miss. 413, 62 So. 421; the case should and must be affirmed. The announcement or ruling of the court in the *Huston Case*

was a new and radical departure from the previous hold-
ings of our court. Our court, in *Virgil* v. *State,* 63 Miss.
320, *Parker* v. *State,* 102 Miss. 113, 58 So. 979, and numer-
ous other cases, had condemned in unmistakable terms the
returning of a verdict of manslaughter in a case of this
kind, and the correctness of our decision in the *Huston
Case* has been earnestly and repeatedly challenged by
eminent counsel. The majority of the court as now con-
stituted believe the *Huston Case* was and is wrong and
should be overruled, and this court should turn to the hold-
ing of and readopt the decisions expressly overruled by
the court in the *Huston Case.* We have given this subject
careful consideration, and hereby overrule the *Huston
Case,* and return to the safer and sounder principle well
announced by Judge Cook in *Parker* v. *State, supra.*
The court in that case uses this language which meets with
our approval:

"The instruction authorizing the jury to convict the
defendant of manslaughter was vicious in the extreme;
when applied to a case like the one under review. There
is no halfway ground here, no debatable question, except
the defendant's guilt or innocence of the crime of murder.
To advise the jury that they could compose their differ-
ences and doubts, if any they had, by finding the defend-
ant guilty of a lesser crime, without evidence to support
the verdict, is unfair to defendant and manifest error."

The crime of manslaughter in our state is defined by
statute separately and apart from the statute defining
murder, and there are different states of facts that con-
stitute what might be termed different kinds of man-
slaughter. It has been the policy of our lawmakers as
well as of the courts to recognize a marked difference
between murder and manslaughter, and to provide differ-
ent punishments therefor. The defendant in this case
was entitled to an instruction eliminating from the con-
sideration of the jury the crime of manslaughter and tell-
ing the jury expressly that they must find the defendant

guilty of murder or nothing. As stated by Judge Calhoun in *Johnson* v. *State*, 78 Miss. 627, 29 So. 515:

"To say to the jury, You 'may find' a verdict of guilty of manslaughter, would mean that they might properly so find, whereas there is absolutely nothing in the evidence to warrant such a finding."

The court therefore, in granting the instruction authorizing the jury to return a verdict of manslaughter, initiated the error, and thereby, perhaps, led the jury into the serious error of returning an unauthorized verdict. In the present case the testimony of the defendant as to the demonstration made by the deceased at the time appellant began firing is not contradicted by the positive testimony of a single witness. The state is compelled to depend upon the use of a deadly weapon and other circumstances to show that appellant, and not the deceased, was the aggressor at the critical moment of the fatal encounter. The testimony of the accused as a witness in his own behalf cannot arbitrarily be discarded by the jury, and there is no fact or circumstance disclosed by the defendant's own testimony and no word uttered indicating that appellant was under the heat of passion or acted otherwise in a way indicating manslaughter. Our court is not alone in the holding announced in *Parker* v. *State*, *supra*, and a long line of well-reasoned cases decided by our court prior to the *Parker Case*. The same question is well treated by the case of *Bates* v. *State*, 4 Ga. App. 48, 61 S. E. 888, and other well-reasoned cases of the Georgia court. The court, speaking through Hill, C. J., in the *Bates Case*, says:

"If the evidence for the state was the truth, the verdict should have been for murder. . . . If the defendant's statement was the truth, the defendant should have been acquitted. . . . The charge on the law of voluntary manslaughter led the jury away from the consideration of the truth as it existed in the evidence, or from the truth as it existed in the prisoner's statement, and induced them to agree on a compromise verdict, without any evidence

whatever to support it. Therefore, following the repeated rulings of the supreme court and of this court, we are constrained to hold in this case that the law of voluntary manslaughter was improperly given in charge by the court, and that the verdict of the jury for this offense, being without evidence, must be set aside as contrary to law.''

Likewise, in the case of *Flynn* v. *State,* 43 Tex. Cr. R. 407, 66 S. W. 551, the court of criminal appeals of Texas, through Henderson, J., says:

''Appellant's own evidence (and he is the only witness testifying on this point) states that he shot at deceased because he believed he was advancing on him to rob him. From either standpoint it cannot be claimed there was any negligence, because there was an intention to kill. We accordingly hold that the court erred in submitting the issue of negligent homicide at all, even if it be conceded that same was properly submitted in the charge, which is not the case here.''

We refrain from discussing the evidence in detail. It is sufficient to say there is ample evidence of threats, of bitter feeling entertained by the deceased toward appellant, and the uncontradicted evidence reflects that appellant, to use a common expression, had the drop on the deceased at the time it appears deceased waylaid and might at that time have taken the life of the deceased, but deliberately refrained from doing so. The setting was such that the community would not be surprised to hear of either party having been killed.

We do not think any error was committed by the court in permitting the witness for the state to testify that the rifle of the deceased was on safety. It is true several hours had elapsed since the shooting, but the evidence discloses that all parties left the scene of the homicide immediately after the shooting without disturbing the body of the deceased, and there is nothing in the evidence to indicate that any one approached the body of the deceased for examination or other purpose before the sheriff's posse

arrived. Of course, defendant was privileged to rebut this testimony in any legitimate way.

While the law should be enforced, the liberty of defendants charged with crime should not be compromised by juries. We close this opinion with words borrowed from Judge Terral in the case of *Strickland* v. *State,* 81 Miss. 134, 32 So. 921:

" . . . Whenever the life of a human being is in the balance, it is but just to him that the law governing the case made against him be properly stated to the jury."

*Reversed and remanded.*

Smith, C. J., dissenting.

Cook, J. (specially concurring). I concur in the judgment of the majority that this case should be reversed; but I think this case and the *Huston Case,* 105 Miss. 413, 62 So. 421, may be differentiated. The sole issue arising from the evidence in the *Huston Case* was the identity of the slayer; while in the present case Rester, the defendant, admitted that he killed the deceased. In the *Huston Case* the court, in its instruction to the jury, correctly define manslaughter; while in this case the court did not define manslaughter at all. In the *Huston Case* the jury reached the conclusion that Huston was the slayer of Harris, but by a misinterpretation of the court's instruction convicted Huston of manslaughter. There could have been no compromise on the facts in the *Huston Case.* Huston either killed Harris or he did not; there was no middle ground on this issue. The jury decided this issue against Huston, and erroneously, but to his benefit, labeled the crime manslaughter. By confiding the *Huston Case* within the limit of its own facts, I think the decision was logically sound.