### JONES *v.* STATE.

[92 South. 578. No. 22193.]

HOMICIDE. *Refusal of manslaughter instruction held not error.*

In a trial for murder it is not error to refuse a manslaughter instruction requested by the defendant, based on evidence that deceased had insulted defendant's wife, and threatened defendant's life if the wife told it, and that she did tell her husband of the conduct and threat, where the evidence clearly shows that the killing was about other matters, and nothing was said about the matter at the time of the killing by either party.

APPEAL from circuit court of Jones county.
Hon. R. S. HALL, Judge.

Val Jones was convicted of murder, and he appeals. Affirmed.

*H. B. Collins,* for appellant.

We say that the court erred in refusing the two instructions asked for by the defendant, appellant here, on the question of manslaughter or in refusing any and all instructions on the question of manslaughter. The court in refusing these instructions stated to counsel for the defendant that the evidence would not warrant any instruction shown on pages 15 and 16 of the record. We say the court erred, for we think there is ample evidence in the record to warrant the jury in finding that the appellant fired the shot in the heat of passion and not be-

cause of any premeditated design to kill the deceased, and if there is a conflict in the testimony, then the question should have been submitted to the jury.

Mr. Chief Justice SHAW in discussing the question of manslaughter says: "Manslaughter is the unlawful killing of another, without malice, and may be either voluntary, as when the act is committed with a real design and purpose to kill, but through the violence of sudden passion, occasioned by some great provocation, which in tenderness for the frailty of human nature, the law considers sufficient to palliate the offense." 13 R. C. L., section 88.

Again in discussing passion as an element of manslaughter Ruling Case Law uses the following language: "Nor is this passion limited to rage, anger, or resentment: It may be the emotion expressed by the terms fear, terror, and according to some decisions excitement or nervousness." 13 R. C. L., sec. 91, page 786.

Again in the same section: "The existence and sufficiency of passion, whether it arose from adequate provocation, and whether it rendered the slayer's mind incapable of cool reflection, and whether it furnished the incentive to his action, are all questions for the jury in a case in which they arise."

So we say that if there is any evidence that would tend to show that the killing was done in a heat of passion, then it should be submitted to the jury under proper instructions on the question of manslaughter.

Again Ruling Case Law, section 92, page 787 says: "In determining whether the act which caused death was impelled by heat of passion or by malice, the surrounding circumstances and conditions are to be taken into consideration. The time elapsing between the provocation and the killing, the manner of killing, the character of the instrument or weapon, whether deadly or otherwise, a repetition of blows, and all of the attendant facts and circumstances are to be considered. Nor is the slayer's mental state to be determined solely by

what takes place at the time of the killing. Reference is to be had to the previous relations of the parties, indignities and insults given on other occasions, circumstances pointing to preparation, and the like."

In other words the above seems to convey the idea that a man who had been repeatedly insulted and suffered repeated indignities at the hands of another would not be as hard to insult and his excited passion so hard to arouse as it would be at the hands of one who had never insulted him or heaped indignities upon him, and that a man who had been repeatedly threatened and put in fear by another would not be as hard to put in fear by this same person as he would if the party had never threatened him or put him in fear. Hence, the law is that all the surrounding circumstances are to be considered in determining whether there are any elements of passion shown in the testimony.

Now here is a man who had been informed that another man had attacked his wife on three different occasions, tried to force her to have improper relations with him, and when she refused, he threatened to kill her and her husband. On numerous occasions he had heard this man threaten to take his life, and one time this man had drawn his knife on him and threatened to cut his throat. As he left the house on the night of the shooting he heard this man say that he would kill him when he returned, and heard another man making preparations to secure a gun to use on him. When he returned and entered the room where he, this man and a number of others had been gambling, he found them all scattered. Instantly this man appeared in front of him with a pistol in his hand and applied a vile epithet to him; he heard a gun snap in an adjoining room. If such a condition and such surroundings are not enough to excite a man of ordinary intelligence, and to place his mind in such a state of excitement and fear as to cause him in the excitement to do violence to his apparent antagonist, then pray tell me what it would take to excite a man to such an extent that

his actions could be said to have been done "in a heat of passion?" Why it occurs to us that this is enough to completely dethrone judgment and reason and to drive a man for the moment into utter insanity, let alone drive him to such a state of mind as might be construed as "in a heat of passion."

Hence, we say that from a careful consideration of the evidence and the instructions asked for by the appellant as set out in the record on pages 15 and 16, that these instructions properly and correctly propounded the law in this particular case and that the court erred in refusing to grant them.

*Wm. Hemingway,* assistant attorney-general, for the state.

Appellant complains of the refusal of two instructions on the question of manslaughter, as shown on pages 15 and 16 of the record. These instructions were on the threats and the insults of his wife. The court will note that notwithstanding all these occurrences they were in this game apparently on friendly terms—at least there was an armistice between them; no attempt to carry out any threats. These instructions might have helped the state in showing malice on the part of the defendant in that he was prepared to resent the insults of his wife and to defend himself in case the accused attempted to put the threats into execution, but he never armed himself until the quarrel at the card game. He had no right according to the ethics of the "skinning profession," to return to the game. If he had been peaceably inclined he should have stayed away from the house, but he went back with a gun, stood it where he could reach it. His whole plan disclosed premeditation, and the willingness of entering into a combat when he could have stayed out of it. He left the crowd of negroes under the impression that when he came back trouble would begin. It was probable that if the deceased had killed the accused,

that he would not have been convicted even though he shot him as he stepped inside of the door.

Instruction No. 10 presents the theory of self-defense. Instruction No. 6 tells the jury the law in the case he was preparing to defend himself against the threats. A reading of the instructions will disclose that the case of the defendant was well submitted to the jury. There cannot be any question of manslaughter when a man deliberately returns to a place armed, after making threats himself. He is not guilty of manslaughter. He is guilty of murder or nothing. If his story is believed, and the jury seems to have rejected it, it was a clear case of self-defense. If the state's witnesses are to be believed, it is a clear case of murder. It is unnecessary to cite authority in this further than to call the attention of the court to the Rester case.

ETHRIDGE, J., delivered the opinion of the court.

The appellant, Val Jones, was indicted and convicted of murder, and sentenced to the penitentiary for life, for the killing of one Mack Williams. The killing occurred at a place where a card game known as "skin game" was being played for money. Jones was a participant in the gambling, and in the course of the play was broke. At first he borrowed some money from some of the other people in the game, and also lost that. He attempted to borrow more money, but was unable to do so. He stated in what appears to be a jocular manner that if he had a gun he would hold up the crowd in the game. One of the players remarked that he would furnish the gun if Jones would divide the proceeds with him. While this conversation was being indulged in the deceased, Mack Williams, stated to Jones that he would not hold him up. Jones replied that Mack would be the first son of a bitch he would throw the gun on. Jones then left the house where the game was being played, went home and secured more money from his wife, and

took his Winchester and returned to the game. When
Jones left the game to go home Williams' stated after
Jones had gotten out of the house that he believed he
would go and get some more catridges, that Jones might
return and attempt to hold the game up. It seems also
that another player secured a gun in Jones' absence.
When Jones returned he opened the door and stepped
in the room, and there seems to have been a scattering
of the negroes, but, according to some of the state wit-
nesses, Mack Williams faced him with his pistol in his
hands, when Jones said, "What are you all scared about?
I ain't got nothing," and held up his coat to show that
he did not have his pistol, whereupon Williams returned
his pistol to his pocket, according to the state witnesses,
and turned his back on Jones, and said to another negro,
"Let's go on with the game." The other remarked he
would let it air, and left. That when Williams turned his
back Jones reached outside the door where he had left
his Winchester, obtained it, and fired, shooting Williams
in the back. He then walked to where Williams was, and
stood over his body, when Williams fired at him two or
three times, inflicting a wound upon the defendant. Wil-
liams died in a short while. According to some of the
state witnesses, when Jones reentered the house Wil-
liams got behind the door with his pistol in his hands,
but when Jones stated he had nothing, and pulled up his
coat to show he had no pistol, Williams put up his pistol,
and turned to some of the other parties present, and
said, "Let's go on with the game," and the others de-
clined to do so, and Williams said, "You are not going
to let this negro break up the game, are you?"

There was testimony on the part of Jones' wife that
the deceased had insulted her on previous occasions, and
had threatened to kill her husband if she told him of
Williams' acts, and that she did tell her husband of Wil-
liams' conduct. On this evidence defendant requested
two instructions on the subject of manslaughter, which
were refused by the court, and the refusal is assigned as

error. It is insisted that Jones, having knowledge of these threats, may have been in great fear of Williams, and that fear, as well as rage or anger, would constitute such passion as to reduce the killing from murder to manslaughter. A complete answer to all of these contentions is that nothing was said on the night in question about this matter. There was no quarrel or dispute growing out of Williams' conduct towards defendant's wife. There is nothing in the circumstances disclosed by the evidence to reduce the killing to manslaughter. If Jones' evidence be taken into consideration be sought to establish self-defense, and there is nothing in his own testimony to warrant the belief that he shot the deceased because of any ill treatment of his wife by the deceased.

There was no error in the trial, and the judgment is affirmed.

*Affirmed.*