# DIXON *v.* STATE.

(In Banc.  Oct. 17, 1932.)

[143 So. 855.  No. 30089.]

John B. Gee, of Midnight, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

**Cook, J.,** delivered the opinion of the court.

The appellant was jointly indicted with Robert Woodward on a charge of the murder of Joe Rustici. There was a severance, and upon the separate trial of the appellant, he was convicted and sentenced to be hanged.

The facts upon which the conviction was based, as they appear from the record, are substantially as follows: Joe Rustici, who was sixty-eight years old, owned and operated a grocery store in Silver City, in Humphreys county; Mississippi. Adjoining this store-room, and opening into it, were a bedroom and kitchen used and occupied by him. Several years prior to the homicide the appellant had been employed by Rustici as a servant in and around the store and premises, and still had free access to all parts of the building, but, at the time of the homicide, the defendant, Robert Woodward, had succeeded him as the servant and attendant of the

deceased. On the night of the homicide, the appellant, Robert Woodward, and a woman, Annie Laurie Bridges, were in and around the store and in the kitchen, where they prepared and ate supper. There were also several white men in the store when the proprietor was ready to close, and all these parties went out in front of the store. Rustici closed the front door of the store and went into his bedroom. Robert Woodward and Annie Laurie Bridges went a short distance down the street and sat in the window of a vacant building, while the white men and the appellant stood conversing in front of the store about fifteen minutes. The white men then entered an automobile and drove away, leaving the appellant in front of the store.

The following morning the deceased was found lying dead in the storeroom in a pool of blood. There were many wounds and bruises on his body, the skull was crushed in several places, and his jaw and one of his shoulders broken. The furnishings of the storeroom were in confusion, and there was a large quantity of blood on the floor of the room. Near by were two twine-holders, one made of iron and the other of glass, and both were covered with blood. The iron twine-holder weighed about two and one-half pounds, while the glass one was slightly heavier. The pockets of the deceased's clothing were turned inside out, and the disorder in the rooms of the building indicated that they had been ransacked.

Adeline Wheeler, at whose home the appellant and Annie Laurie Bridges were staying, testified that at ten minutes after eleven o'clock, Robert Woodward was at her home, and that the appellant came to the front and called him out; that later the appellant came back, washed at a hydrant in the yard, and then came into the house; that his clothing was bloody, but he explained that his nose had been bleeding; that he had a roll of money and paid her three dollars and then went into the

room where Annie Laurie Bridges was in bed; that she later ordered the appellant to leave her home, and that he and Annie Laurie Bridges did leave. She further testified that the next morning she found a bloody lining of a coat sleeve by the side of her house. She identified the shirt and coat that the appellant had on the night of the homicide. The lining was gone from one sleeve of the coat, and she testified that the coat sleeve lining which she found was of the same character of material as the lining remaining in one sleeve of the coat.

Annie Laurie Bridges testified that the appellant came to her room at the home of Adeline Wheeler and exhibited to her a sum of money; that he stated that he and Robert Woodward had taken the money from Joe Rustici, and that Rustici had recognized him and struck him with a flashlight; that he "jumped down on Mr. Joe and choked him;" that the appellant gave her thirty dollars, and they then went to the home of Ed Blair; that she gave this thirty dollars to Emma Blair; and that later in the night when she became very much frightened, the appellant said to her: "You ain't done nothing, I am the one that killed old man Joe."

After some investigation following the discovery of the murder the next morning, E. S. Nolen was deputized to arrest the appellant. He went to his home to get his pistol out of a safe, and while engaged in opening the safe the appellant appeared at his side and asked for a drink of whisky. The appellant had a pistol sticking in his belt, and was wearing a bloody shirt. When the officer succeeded in opening his safe, he picked up his pistol and covered the appellant with it, and ordered him to put up his hands. When he was a little slow in so doing, the officer jabbed him with the pistol, and called another party to search the appellant and take his pistol. This search revealed a roll of money, some of which was bloody. This officer testified that while he had

the appellant covered with the pistol and while the search of his person was in progress, he said to him, "How come you go over there and kill old man Joe?" And the appellant replied, "I did not kill him." That he (the officer) then said: "Don't you know everybody knows you killed him. There is his gun, and you are bloody, and you have got a pocket full of money. Where did you get that?" And the appellant then replied, "Yes, sir, go get Robert Woodward too."

John D. Purvis, sheriff, testified that the appellant made certain statements or confessions to him which were free and voluntary on his part, and made after he had been warned that any statement he made would be used against him. The substance of this statement of appellant, as detailed on direct examination of the sheriff, was that he and Robert Woodward agreed that Woodward would take some groceries from the deceased's store and place them by a coal house at the rear, and that he (the appellant) would carry them away; that when he went to the rear of the store to get the groceries, Woodward opened the back door of the store and called to him to come in; that he then followed Woodward into the store, where they found Rustici; that Woodward threw at Rustici and struck the appellant. On cross-examination of this witness, further details of the statement made by the appellant were developed to the effect that after Woodward threw something and hit him over the eye, he heard another lick and heard Joe Rustici, the deceased, groaning; that he then said, "I am going to leave," and Woodward said, "If you leave, I will kill you." The sheriff further testified on cross-examination that the appellant stated that after they left the store, Woodward threw the decedent's pocketbooks under the front gallery; that they then went to a hydrant and washed some of the blood off of him (the appellant); that they then went to a ginhouse near

by and divided the money and then went to Woodward's home, where Woodward secured a pair of yellow trousers for the appellant; that they then went to the river and undressed and he (the appellant) put on the yellow trousers, and Woodward then threw something into the river. The sheriff further testified that he detailed his movements for the balance of the night, all of which were in accord with the testimony of other witnesses, which has been already herein detailed.

The appellant also stated to the sheriff that the blood on his person and clothing on the night of the homicide came from the wound on his head, caused by the blow received by him when he was in the store. Certain other facts will be stated in connection with the discussion of the assignments of error based upon the admission of certain exhibits.

The first assignment of error is based upon the action of the court in refusing to permit the appellant to peremptorily challenge a juror who had already been accepted by both the state and the appellant. The special bill of exceptions setting forth the facts upon which this assignment is based, shows that a full panel of twelve jurors was accepted by the state and tendered to the appellant, whereupon he peremptorily challenged five jurors and accepted the remaining seven. The panel was again filled, accepted by the state, and tendered to the appellant, who then sought to peremptorily challenge one of the seven jurors who had been previously accepted by him. The court refused to permit the challenge, and the appellant assigns this action of the court as error.

That there is no merit in this assignment has been decided by this court in at least three cases. In the case of Gibson v. State, 70 Miss. 554, 12 So. 582, 583, the court said: ''Under the statute, a full panel should be passed on and accepted by the state, and tendered to the de-

fendant. He should then be required to peremptorily challenge all those of the panel so presented he desires. The state should then fill the panel, and again present it to the defendant, who should then be allowed and required to continue his challenges from those added by the state until he has exhausted those to whom he objects, within the limits of his challenges, when the state should again fill the panel, and present it to the defendant, and thus proceed until a jury is secured."

The same view was again announced in the case of Funderburk v. State, 75 Miss. 20, 21 So. 658, 659, in the following language: "By section 1423 of the Code he was entitled to have presented to him a full panel of jurors, all of whom had been accepted and tendered to him by the state. It then devolved upon him to challenge as many of that panel as he designed to challenge, and then the vacancies caused by his challenges must have been filled by others accepted and tendered him by the state, when he might challenge the added jurors, but not any of those of the original panel, and so on. Gibson v. State, 70 Miss. 554, 12 So. 582."

Section 1423, Ann. Code 1892, is the same as the statute now in force, section 1277, Code 1930, and in the case of Gammons v. State, 85 Miss. 103, 37 So. 609, the interpretation given this statute in the above-mentioned cases was approved and reaffirmed.

The appellant next assigns as error the refusal of the court to exclude the statement in the nature of a confession made by the appellant at the time he was arrested and searched. This statement was admitted without objection, but at the end of the cross-examination of the witness Nolen, the arresting officer, there was a motion to exclude it. The contention of the appellant upon this point seems to be that since the statement was made in response to an accusation by the officer, and at a time when he had a pistol pointed at the appellant, it was

not free and voluntary but was the result of duress or fear of bodily harm. The mere exhibition and presentation of a pistol by an officer who is endeavoring to arrest a suspected perpetrator of a homicide, who is known to be armed, is not such duress as will render inadmissible a statement made by such suspect while the arrest, search, and disarming of the suspect is in progress. In the circumstances under which this statement was made by the appellant, as shown by the evidence, there was nothing to indicate duress or any cause for fear of bodily harm to the appellant, if he submitted peaceably to the arrest. The motion to exclude this statement was properly overruled. The statements or confessions made to the witness Purvis, which do not appear to have been objected to, were shown to have been freely and voluntarily made by the appellant after he had been fully warned that any incriminating statements made by him would be used against him at his trial.

The appellant next assigns as error the action of the court in overruling an objection to the witness Purvis answering the following question: "What became of the money that was taken off Joe?" Other than the circumstances and the confessions of the appellant, there was no direct evidence that the money in question, which was taken from the person of the appellant at the time of his arrest, was originally taken from Joe Rustici, the deceased; but in view of all the circumstances in evidence tending to show that the money was taken from the deceased, and also the confessions of the appellant that he received as his share of the loot a considerable sum of money that was taken from the deceased by Robert Woodward, we think there was no reversible error in so describing the money in the question propounded to the witness Purvis.

The appellant next complains of the admission in evidence of two packages of money, and two checks which

were found on the floor near the body of the deceased and which had blood on them. The two checks were sufficiently identified, and no error was committed in admitting them in evidence. One of the packages of money was identified by the witness F. L. Gilmer, who was sheriff at the time the homicide occurred, as having been in his presence taken out of a pillow case at the home where the appellant spent the latter part of the night of the homicide; and in view of all the circumstances tending to identify this money as having been in the possession of the appellant on the night of the homicide, we do not think there was prejudicial error in admitting it in evidence. As to the second package of money, the package or covering in which it was contained was identified as being the package in which the money taken from the appellant, when he was arrested, was placed; but there was some confusion in the evidence as to whether all the bills that were originally placed in the package were there at the time of the trial. The witness Gilmer testified positively that when the package was turned over to him, it contained three one-dollar bills which had blood on them, and that these bills were sent in Memphis for expert examination. At the trial, he was unable to identify any dollar bills in the package which showed evidences of blood. There was, however, testimony to the effect that a sum of money was taken from the appellant's person and turned over to the witness Purvis, and by him turned over to the witness Gilmer, and the package in which this money was placed by Gilmer was produced at the trial; and if it be conceded that the testimony was to some extent uncertain as to whether the contents of the package were then the same as when it was turned over to Gilmer, we do not think the rights of the appellant were in any way prejudiced by the admission of the package of money, if, in fact, it was ever formally offered in evidence, which from the record before us is not at all clear.

The appellant next complains of the action of the court in permitting a witness to testify that a discoloration on certain trousers which were offered in evidence was blood. It does not require an expert to testify that a discoloration on clothing is blood, particularly where, as in this case, the discoloration is examined by the witness when it is fresh.

The appellant also assigns as error the action of the court in granting the state an instruction defining murder and authorizing the jury to convict of murder, and in refusing to instruct the jury, at the request of the appellant, that it could not find him guilty of a higher degree of homicide than manslaughter. In the facts in this record, there can be found no element of manslaughter. The deceased was killed in the nighttime in his store adjoining his bedroom, by a person or persons who entered the store burglariously or with larcenious intent. His skull was beaten and crushed in numerous places, his jaw and shoulder were broken, his head and face were beaten into an almost unrecognizable pulp, his pockets were rifled, and his building ransacked and left in a state of disorder. It is impossible to conceive of any element of manslaughter existing in this state of facts.

The other assignments or error are wholly without merit. The evidence amply supports the verdict, and we find no error that would warrant a reversal of the judgment of the court below.

The judgment and sentence of the court below will therefore be affirmed, and Friday, November 18, 1932, is fixed as the date of execution.

Affirmed.