NEWELL *v.* STATE.

In Banc. Nov. 6, 1950.

No. 37536 (48 So. (2d) 332)

Easterling & Easterling, for appellant.

**George H. Ethridge,** Assistant Attorney General, for appellee.

**Hall, J.**

Appellant was convicted of the murder of Forest Sims and sentenced to death upon the verdict of a jury which fixed that penalty. The first question raised on appeal is whether the trial court erred in overruling a motion for continuance. The killing occurred on July 15, 1949. Appellant was apprehended on July 16 and after being questioned at Laurel, Mississippi, he was on the same date placed in jail at Meridian, Mississippi, which is approximately fifty-five miles from the county site of the county where the murder was committed. No formal affidavit was made against him but he was advised of the nature of the charge on which he was being held and was told that he would be given a preliminary hearing at any time that he desired it. He made no request for such a hearing and indicated to the officers that he did not desire a preliminary hearing. On the first day of the regular August term of court, being August 22, 1949, the grand jury returned an indictment for murder against him. On that same day appellant's relatives employed counsel to represent him, being the same counsel who had visited and talked with him in the jail at Meridian on or about August 2. On August 23, with his counsel present, appellant was arraigned and entered a plea of not guilty, and his case was tentatively set for call on the following Friday, August 26, but on that day the court was engaged in the trial of another matter and the case was passed for call to the following day. On that date appellant filed a motion for continuance based upon the assertion that his counsel had not had sufficient time in which to properly prepare for his defense. This motion was not supported by any affidavit as contemplated by Section 1520, Mississippi Code of 1942. Considerable evidence was offered both by the appellant and by the

prosecution on the hearing of the motion with the result that the trial court overruled it and set the case for trial on August 29. The trial began on that date and was concluded on August 31. At the commencement of the trial appellant did not renew his motion for continuance, and after conclusion thereof he did not file any motion for a new trial or make any showing that he or his counsel had made any effort to further investigate the case or obtain evidence in his behalf.

The record shows that every witness who knew anything about the case lived within fifteen miles of the courthouse where the trial was conducted, that the presence of all witnesses whom appellant desired on his motion for continuance was obtained and these witnesses were in attendance and testified on the motion, and appellant admitted that the sheriff had offered to obtain the presence of every witness that he desired for the trial on the merits but he did not request process for any witness, did not testify on the trial, and did not offer any evidence whatever. There was no contention that he wished the attendance of any witness. The trial began one week after the final employment of counsel to defend him.

In the motion and in the argument of the point under consideration appellant's counsel makes a strong appeal based upon matters which may in some minds arouse sympathy over appellant's plight but which afford no ground for a continuance of his case. Illustrative of these matters, the record shows that about 10 a. m. prior to his arrest that afternoon, while he was evading the officers, appellant was shot by some unknown party who is affirmatively alleged in the motion not to have been an officer of the law and whose name is not disclosed by the evidence, but the full import of this incident is that he was merely sprinkled with a charge of bird shot, evidently from a considerable distance, and the proof establishes conclusively that the wounds thereby inflicted were super-

ficial only and were of no serious consequence and were not sufficient to retard his flight in his effort to avoid arrest or to interfere in any manner with the preparation of his defense. When apprehended by the officers he was carried to jail clothed in the same raiment which he was wearing at the time, being in overalls and without shoes, in which situation he remained in jail until his relatives brought fresh clothing to him about seventeen days later, but there is no contention that he thereby suffered any ill effects, the time being the last half of July when the weather is always so hot in this section that many people, particularly children, wear no shoes; it is not claimed and could not be successfully contended that this prevented appellant from preparing his defense. After his arrest and incarceration appellant's home was looted by unknown vandals, and it is charged in the motion and argued in the brief that he was thereby deprived of his life's earnings and rendered penniless and powerless to employ counsel, but the proof justifies the conclusion that appellant took from his victim's dead body a sum of money considerably in excess of $100, and on the same date took a cattle buyer to his victim's pasture and sold three head of cattle therefrom for which he received $150, and later appellant's wife sold his automobile for $400, out of which the last monthly payment due thereon was made. Appellant's sister was active in his defense and testified on the motion that she employed the attorney to represent him on the day of his indictment and on cross-examination she said that he had all the information necessary for defense of the case and that it was ready for trial; on redirect examination she said that she didn't know whether appellant's attorney could be ready for trial the following week but she imagined he could. The case was tried the following week and appellant's counsel conducted the defense with skill and ability and manifested a rather complete knowledge of the details of the evidence.

It is further argued that appellant, after his arrest and until the day of his arraignment, was kept in the jail at Meridian, Mississippi, which is in an adjoining county and approximately fifty-five miles from the place of trial, and that he was not permitted to confer with friends and relatives or arrange for his defense, and particularly that he was denied the opportunity of private conference with his counsel prior to the trial. Our law fully authorizes the removal of a prisoner to the jail of some other county and such a procedure is common practice throughout the State. It is no indication of and there is no proof suggesting that it was because of any fear of mob violence. It may have been because the jail in Jasper County was already fully occupied or considered not sufficiently secure to prevent the escape of the prisoner. The latter is the most common reason for the transfer of a prisoner to another county for safe keeping, but, regardless of the reason for his removal, the proof strongly controverts the assertion that appellant was not permitted to privately confer with his friends and relatives and counsel and prepare his defense, as to which see Garner v. State, 202 Miss. 21, 30 So. (2d) 413.

It is also argued that public sentiment against appellant was at a high pitch, but there is not one word of evidence to support this charge, and no motion was made for a change of venue. We have rather extensively summarized the several points made in the argument on the question of overruling the motion for continuance.

Our statute, Section 1520, Code of 1942, provides and this Court has repeatedly held that ▮▮ the granting of a continuance is a matter largely within the discretion of the trial judge and that refusal of a continuance will not be grounds for reversal unless that discretion has been abused and the Court is satisfied that injustice has resulted therefrom. McDaniel v. State, 8 Smedes & M., 16 Miss. 401, 47 Am. Dec. 93; Cox v. State, 138 Miss. 370, 103 So. 129; Jones v. State, 168 Miss. 702, 152 So. 479;

Hodgkin v. State, 172 Miss. 297, 160 So: 562; Allgood v. State, 173 Miss. 27, 161 So. 756; Ellis v. State, 198 Miss. 804, 23 So. (2d) 688; Cody v. State, Miss., 24 So. (2d) 745; Jackson v. State, 199 Miss. 853, 25 So. (2d) 483; Parker v. State, 201 Miss. 579, 29 So. (2d) 910; McGee v. State, Miss., 40 So. (2d) 160, not yet reported in the State Reports, appeal dismissed and certiorari denied 338 U. S. 805, 70 S. Ct. 77, 94 L. Ed. —.

██ ██ Upon a consideration of everything shown by the record we are of the opinion that the trial judge did not abuse his discretion in denying a continuance and that no injustice has resulted. It is interesting to note that the killing occurred on July 15, appellant was indicted on August 22, arraigned on August 23, and put to trial on August 29, which was exactly one week after indictment and six days after arraignment. In the case of Freeman v. State, Miss., 29 So. 75, a killing occurred on May 31, an indictment was returned on June 1, Freeman was arraigned on June 2, and put to trial on June 8, which was exactly the same space of time after indictment and arraignment as elapsed in the case at bar, and the Court said in that case that while the trial followed speedily after the murder the appellant was ably defended by competent counsel and cannot complain of the result of the trial, citing Jones v. State, 60 Miss. 117, 123, wherein Judge Campbell commented that the granting of a speedy trial is a constitutional right insured to a defendant although not asserted by him. In the case at bar there was no undue or indecent haste to the detriment of appellant.

Section 2518, Code of 1942, provides "All indictments shall be tried at the first term, unless good cause be shown for a continuance." In McClellan v. State, 183 Miss. 184, 184 So. 307, 308, this Court said: "To hold that ten days is insufficient time to prepare a criminal case for trial where it is not shown that the witnesses are unavailable would mean that a capital case could rarely

ever be tried at the term during which an indictment is returned, and especially where there are civil cases to be heard during the term either before or subsequent to the trial of the docket of criminal cases. A compliance with the statute referred to would make for a more efficient administration of justice. The failure to comply therewith is all too frequent." See also Goins v. State, 155 Miss. 662, 124 So. 785.

In the case at bar the appellant's counsel had a week in which to prepare for trial and it is not shown that any witnesses whom he may have desired were unavailable. Moreover, he did not renew his motion on the day the trial began and did not, after conclusion of the trial, make a motion for a new trial. It is well settled by numerous decisions in this State that when a motion for continuance is overruled prior to the trial, the defendant and his counsel should continue their efforts in investigating the case and securing witnesses even during the trial and after conviction, and file a motion for a new trial presenting the witnesses or their affidavits as to what they would have testified if they had been present at the trial. Ogden v. State, 174 Miss. 119, 164 So. 6. There must be a showing of continued diligence at every stage of the proceeding. Robinson v. State, 178 Miss. 568, 173 So. 451, and authorities therein cited; Bone v. State, 207 Miss. 20, 41 So. 347; Thigpen v. State, 206 Miss. 87, 39 So. (2d) 768. In view of what has been hereinabove said, we are of the opinion that the trial judge did not abuse his discretion and that no prejudicial error resulted from his overruling the motion for continuance.

Appellant's second assignment is that the trial court erred in refusing an instruction which, among other things, would have charged the jury that "the State is bound by the testimony of each and every witness offered for and on behalf of the State." This instruction was correctly refused. In Rester v. State, 110 Miss. 689, 695, 70 So. 881, 883, it is said: "It is the province of the

jury to pass upon the facts of a case and to believe parts of the evidence of either side and discard any portion of the evidence either for the state or for the defendant." This was quoted with approval in Martin v. State, 112 Miss. 365, 73 So. 64. In Hall v. State, 128 Miss. 641, 91 So. 397, 398 it was said: "Where there is a conflict in the testimony as to the facts of the homicide, the jury are not compelled to believe absolutely the facts as testified to by the witnesses for the state, or those for the defendant. They may believe some of the facts testified to by the state's witnesses and other facts testified to by the defendant's witnesses."

The next assignment is that the trial court erred in refusing to grant a manslaughter instruction which was requested by appellant. This necessitates a review of some of the evidence. Shortly before 10 p. m. on July 15, 1949, the body of deceased was found lying in a much traveled paved state highway. Maggots were working in his eyes, nose and mouth. According to expert testimony he had been dead between eleven and sixteen hours. His head had been beaten to a pulp; across the back of his head and extending up into the crown his skull was crushed completely into the cavity from which brain tissue exuded; the skull was also fractured over the temple; the right side of his skull was broken and crushed; the right lower jaw was fractured and one of the eyes bruised and blackened; all these wounds were inflicted with some kind of blunt instrument.

Deceased had left his home about 6:30 a. m. on that date and had gone to his pasture where he kept a large number of cattle. He was engaged in the business of buying and selling cattle as well as farming and always carried with him a billfold containing a large sum of money. When he left home to go to the pasture he had in his billfold a $100 bill and a $20 bill, as well as a considerable amount of other currency the exact denominations and amount of which was unknown. He was never again

seen alive by any of his relatives or friends. When his body was discovered this billfold was missing and neither it nor the money which it contained was ever found.

A search was instituted in deceased's pasture, and near an outside fence in a clump of small bushes there was found a large pool of blood, in which maggots were working. The grass and small bushes were crushed down as if something had lain on them. A few feet away there was a small dogwood bush covered with green foliage on which there was blood, indicating that this bush had been cut down and used to cover the body. Leading from this spot toward a country road nearby there was a trail along which something had been dragged; where there was grass it had been crushed down, and where there was no grass the dirt showed the signs of this dragging. Plainly visible along this trail were two set of tracks, one of a barefoot person and the other of a person wearing rubber boots. This trail ended in the sand by the side of the said country road where the footprints also ended. Small bits of clothing were found on the barbed wire fence under which this trail led and also on the sharp points of several roots where stumps had been previously removed. Where the trail crossed under the fence a staple had been removed from a fence post so as to permit the raising of the lower strand of wire. Deceased's hat was found at this point. On the sandy ground where the trail ended by the side of the country road there were automobile tracks showing that a car had been driven out of the road and had been turned around. These tracks showed that the front wheels of this car had tires with treads of the type in common use, but the rear wheels had an unusual type of tread such as found only on tires identified as "mud grip" tires. The tread was described as consisting of large round rubber plugs or knobs. It was shown that appellant's automobile was equipped with this type of tires on the rear wheels and that it was the only automobile in the community which was equipped with such tires.

Several people saw appellant's automobile on the public highway the following day and testified without objection that there was a quantity of blood on the rear seat as well as on the door post to which the rear door was hinged.

Late in the morning of July 15 appellant and his family went to Laurel a distance of eight or ten miles where shortly before the noon hour appellant approached a cattle buyer and went with him to deceased's pasture where appellant sold three head of deceased's cattle for which he collected $150. Appellant was a tenant on deceased's farm and thoroughly familiar with the whole place, but did not own any cattle in the pasture, having sold what he owned several days previously. About 6 a. m. on the day of the killing a neighbor went to appellant's home and found that appellant was not there but his family was.

Two of appellant's nephews and a cousin of his wife testified that they went to appellant's home between 6 and 7 p. m. on July 15, and played checkers there until possibly 10:30 p. m.; that between 8 and 9 p. m. appellant said that he was going to the home of a neighbor to get some corn for his hogs and one of his nephews volunteered to go along and help him but he declined this offer and requested his son, age about 13 years, to go; that thereupon appellant, wearing rubber boots, and his son, barefoot, got in appellant's automobile and left and were gone an hour or more, returning about 10 p. m., and upon their return they both went into the kitchen and washed their hands. Appellant's son testified to these facts and related the details of going with his father to the pasture where deceased's body was lying, covered with a small bush, and dragging and carrying the body under the fence and out to the country road where they put it in the automobile, after which they drove out to the state highway and pushed it out of the car onto the pavement where it was found. This witness testified, without objection, that his father told him on this occasion that he had

killed the deceased, that he had requested deceased to keep his cows out of appellant's field, that deceased had said that he didn't give a damn and had struck appellant with a piece of wood and that appellant took it away from him and struck him back.

Another witness who lived about three miles from appellant's home testified that on July 16 appellant came to the home of this witness, and the witness said to appellant "I heard that you killed Mr. Forest" and appellant replied "I sho' did." It was shown that this statement was wholly free and voluntary in every respect. Appellant took a pair of overalls belonging to the wife of the witness and put them on and crawled under a bed in witness' home, and the witness immediately went and notified his landlord after which the officers came in a short time and apprehended appellant under the bed. They testified that this was about 2 p. m.

The chief of police of the City of Laurel then placed appellant in his car and carried him to jail at Laurel. En route he asked appellant what had happened and appellant replied that he had killed Mr. Forest Sims and that Jake Read was the cause of it. This statement was made freely and voluntarily and appellant was not at that time asked to elaborate thereon. After arrival at the jail in Laurel appellant was first examined by a physician who had been called and he removed a few bird shot from under his skin but found no wounds of any consequence.

The sheriff and district attorney came to the jail and in the presence of several persons the district attorney asked appellant about the killing. There were no threats, inducements or physical violence of any nature, and appellant freely and voluntarily stated that Jake Read had come over to appellant's house about 8 or 8:30 a. m. on July 15 and stated that he, Jake, had killed Mr. Sims and told appellant where the body could be found in the pasture; that appellant went and found the body and covered it with a small bush; that Jake Read came

to appellant's home just after dark that night and that Jake and appellant and appellant's son went in appellant's automobile to the pasture and removed the body therefrom and put it in the car and carried it out to the highway and left it there. Jake Read denied every detail of his alleged participation in the killing and in the movement of the body, and by other witnesses accounted for his actions that entire day, proving a perfect alibi. Appellant did not testify except on the admissibility of the confessions which will be discussed later.

These facts make out a perfect case of murder in which there was no element of manslaughter: Deceased was brutally and fiendishly beaten far beyond what would have been necessary to produce death; there was no sign of any struggle about the place where his body was first left; there was no sign of any violence upon the person of appellant except the sprinkling of bird shot inflicted on the day after the killing; appellant made no report of the killing, but, on the contrary, secreted the body and finally placed it in the highway in the nighttime for the evident purpose of trying to make it appear that deceased was struck and killed by an automobile; on the next day appellant made a voluntary incriminating statement to one of his friends and neighbors without any exculpatory explanation; at that time he was fleeing and hiding to avoid arrest; he also admitted to the chief of police of Laurel that he killed deceased but added, without explanation, that Jake Read was the cause of it; later he admitted his having secreted the body but contended that Jake Read had done the actual killing, though it was afterward convincingly shown that Jake Read did not in any manner participate in it; the overwhelming and conclusive proof is that the motive for the killing was robbery; the instructions given to the jury required a finding of malice aforethought and the jury, by its verdict, found that malice was present; the defense instructions submitted to the jury the question of self-

defense, and the jury found against appellant on that issue.

Reverting, now, to the testimony of appellant's son, it is perfectly patent that what appellant told his son tending to make the killing a case of self-defense was purely hearsay insofar as the son was concerned and was wholly self-serving insofar as appellant was concerned and was not competent evidence on which to base a manslaughter instruction even though it went to the jury without objection. It must be remembered in this connection that we are not dealing with a case where appellant or some eyewitness testified to such a state of facts, but we are dealing only with a case where appellant told his son about twelve or fourteen hours after the killing that the deceased had struck him with a piece of wood and that he had taken the wood from deceased and struck him back.

In the case of Richardson v. State, 123 Miss. 232, 85 So. 186, 187, the appellant shot and killed a man on his front porch and as he went back through the house his wife inquired "What have you done?" and appellant replied "Sheppard tried to kill me, and I shot him." Upon objection the court excluded this evidence, but appellant nevertheless requested a manslaughter instruction which was refused. On appeal this Court said: "We regard the statement which the accused made to his wife immediately after the shooting as a self-serving declaration and inadmissible. This evidence was properly excluded. A majority of the court is of the opinion that any instruction upon manslaughter would be erroneous, and that no error was committed in refusing to submit to the jury any alleged issue of manslaughter." See also Lewis v. State, 173 Miss. 821, 163 So. 387, where it was held that an exculpatory statement made several minutes after a confession is self-serving and not admissible in evidence.

In the case at bar, if the appellant or some other eye-witness had testified that deceased struck appellant with

a piece of wood and that appellant took the wood from him and struck him back, then the granting of a manslaughter instruction would have been proper, but neither appellant nor any eyewitness so testified, and it is never proper to grant a manslaughter charge unless there is some competent evidence tending to show that the killing was in the heat of passion and without malice. Here there is no such competent evidence and the whole record points to a case of murder.

Appellant did not testify at the hearing on the merits nor did any other witness testify in his behalf to any facts which would justify the killing or reduce the gravity of the crime. Walker v. State, 192 Miss. 409, 6 So. (2d) 127. In Adams v. State, 175 Miss. 868, 874, 167 So. 59, 60, this Court said: ''By an instruction for the state the court took away from the consideration of the jury a verdict of manslaughter. This action of the court is assigned and argued as error. Under the evidence there was no element of manslaughter in the case. It did not tend to show that the killing was in the heat of passion and without malice; in other words, it was a case of murder or nothing. A manslaughter instruction should be refused where the evidence shows either murder or a justifiable homicide. Ricks v. State, Miss., 151 So. 572; Dixon v. State, 164 Miss. 540, 143 So. 855; Winchester v. State, 163 Miss. 462, 142 So. 454; Bridges v. State, 154 Miss. 489, 122 So. 533; Brister v. State, 143 Miss. 689, 109 So. 728; Leavell v. State, 129 Miss. 579, 92 So. 630; Jones v. State, 129 Miss. 457, 92 So. 586; Ealy v. State, 128 Miss. 715, 91 So. 417.''

In view of the cited authorities we are of the opinion that no prejudicial error was committed in refusing an instruction on manslaughter.

Appellant's next assignment is that the trial court erred in admitting in evidence his confessions hereinabove mentioned. Prior to admission of these confessions the court conducted a separate examination of the wit-

nesses in the absence of the jury and also heard testimony thereon for the appellant and held that the confessions were admissible. They were accordingly related to the jury. It is argued that appellant was in morbid fear of mob violence when the several confessions were made, but there is not one word of testimony in the record to support this charge. It is true that appellant at one time said he was afraid, but there is no suggestion anywhere that any mob was after him or that his fear was produced by any threat or violence or improper conduct of any nature on the part of those present. In fact, when testifying on the motion for continuance he swore positively that he was not scared after he got with the officers and was not scared when he was in the jail at Laurel for questioning, though he did claim that he was suffering from the sprinkling of bird shot earlier in the day. As heretofore stated, the evidence for the State showed that no injury of any consequence was inflicted thereby. The State's evidence further showed that appellant did not show any signs of fear, and that there were no threats, violence, coercion or inducements of any nature influencing the confessions, which latter facts were verified by the appellant himself.

It is further contended on this assignment that appellant was not advised that any statement he made could be used against him and was not advised that he might have the privilege of talking with counsel if he so desired. It has been repeatedly held in this State that failure to warn a prisoner that his statement might be used against him does not render the statement incompetent. Criss v. State, 202 Miss. 184, 30 So. (2d) 613; Wohner v. State, 175 Miss. 428, 167 So. 622; Nichols v. State, 165 Miss. 114, 145 So. 903; Brown v. State, 142 Miss. 335, 107 So. 373; Carothers v. State, 121 Miss. 762, 83 So. 809. We have also held that a failure to offer an accused the benefit of counsel where no request therefor has been made does not vitiate a confession. Moore v. State, 207

Miss. 140, 41 So. (2d) 368, appeal dismissed, certiorari denied, 70 S. Ct. 93, 338 U. S. 844, 94 L. Ed—.

In this case there was abundant testimony to justify the action of the trial court in submitting the confessions to the jury. It was shown conclusively that there was no resort to violence, trickery, abuse, placing in fear, promise of reward or leniency, or any other device or scheme to induce the confessions. Upon the proof we are of the opinion that the trial judge did not abuse his discretion in admitting them in evidence and that no constitutional right was thereby invaded. See Street v. State, 200 Miss. 226, 26 So. (2d) 678, and the authorities therein cited. Ample authority for our conclusion is found in Lisenba v. California, 314 U. S. 219, 62 S. Ct. 280, 291, 86 L. Ed. 166, where the Supreme Court of the United States said: ''There are cases, such as this one, where the evidence as to the methods employed to obtain a confession is conflicting, and in which, although denial of due process was not an issue in the trial, an issue has been resolved by court and jury which involves an answer to the due process question. In such a case we accept the determination of the triers of fact, unless it is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process.''

The last assignment relates back to the first one herein discussed, dealing with the question whether appellant had sufficient time in which to prepare his defense. In testifying on the motion for continuance appellant told of his incarceration at Meridian and said that he did not have any money with him and that while there he tried to employ a lawyer but couldn't. His counsel then asked: ''Who did you try to get?'', and he replied: ''I asked the jailer if he saw one I could see, and he said . . .''. Thereupon, there was an objection by the State as to what the jailer said and this objection was sustained. The witness did not complete his answer nor did his counsel thereupon show what would have been the an-

swer to the question. The rule in this State is that ▮▮▮ when an objection to evidence is sustained the action of the trial court is not the subject of review upon appeal unless counsel either states in the record what is expected to be proved or, in the absence of the jury, has the witness complete his answer to the question so that the trial and appellate courts may judge of its competency. Here neither course was pursued. Mississippi Central Railroad Co. v. Robinson, 106 Miss. 896, 64 So. 838; Lizana v. Edward Motor Sales Co., 163 Miss. 266, 141 So. 295; Gulf, Mobile & Northern R. R. Co. v. Willis, 171 Miss. 732, 157 So. 899, 158 So. 551. Moreover, it was shown that after the alleged conversation with the jailer, and approximately sixteen days after he was placed in the jail at Meridian, appellant was visited by his present counsel and was then advised as to his rights. What the jailer may have said to appellant prior to that time was incompetent and could not possibly have any bearing on the question whether appellant was entitled to a continuance of his case.

After a full and careful consideration of the entire record and of every point raised by appellant, we are of the opinion that no prejudicial error was committed at the trial. The judgment of the trial court is accordingly affirmed and appellant's execution is set for Thursday, December 14, 1950.

Affirmed and execution set for Thursday, December 14, 1950.

**Kyle, J.,** took no part in the consideration or decision of this case.

**Roberds, P. J.,** dissenting in part.

I think the request of defendant for a manslaughter instruction should have been granted. The only evidence in the record as to the details, or manner, of the killing

was the testimony of Jerry Lane Newell, the thirteen year old son of defendant. It is true, as stated in the controlling opinion, there is evidence defendant said he killed Mr. Sims, but nothing, except as given by Jerry, as to the detailed circumstances. Now, the State put this boy on the stand to testify against his father. He says he went with his father to the pasture to remove the body of Mr. Sims. He related this conversation:

Q. "Before you got over there, did he tell you that he and Mr. Forest had had some trouble that day? A. Yes, sir.

Q. "After he told you that, what did you do? A. I didn't do nothing. He said he had told him to keep his cows out of the patch over there and he said, 'He didn't give a damn', and he hit him.

Q. "Did he ever tell you that he had killed Mr. Forest Sims? A. No, sir. He said that Mr. Forest hit him and then he hit him."

If this testimony is true, and the State introduced it, Sims and Newell were having a personal difficulty about the pasturing of cows, and Mr. Sims hit Newell, and then Newell hit Sims. This testimony does not so disclose, but presumably this hitting was with the stick as mentioned in the original opinion. This being a personal difficulty and fight, the jury might well have concluded defendant was acting in the heat of passion and was guilty of manslaughter and not murder. At least, regardless of probabilities as to results, defendant was entitled to the manslaughter instruction.

For many years, this Court has said it is proper to grant to the State a manslaughter instruction in murder charges, although there is no element of manslaughter involved under the facts of the case. Surely then a manslaughter instruction ought to be granted defendant where, under the circumstances, elements of manslaughter are involved.