GALLEGO v. STATE.

No. 39506 January 17, 1955 77 So. 2d 321

720

*Frank Hammond, Jr.,* Moss Point, for appellant.

722

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

McGehee, C. J.

The appellant Gerald A. Gallego, twenty-six years of age, an escaped convict from California in violation of his parole, was tried and convicted on the 9th and 10th days of June, 1954, in Jackson County, Mississippi, of the

murder of Ernest Beaugez, a police officer at Ocean Springs in that county, and sentenced to death. The homicide occurred between midnight and day on May 27, 1954, some 26 to 28 miles east of Ocean Springs, after the appellant had severely beaten and had disarmed the said officer in the jail at Ocean Springs and had compelled him to get in his police car and drive the appellant eastward enroute to Mobile, Alabama, where the latter robbed the American Bank & Trust Company of Mobile of the sum of approximately $1,000.00, some six or seven hours after the homicide.

The proof on behalf of the State, taken in the absence of a jury, disclosed that a few hours after the appellant had been arrested on the day of the killing he made a free and voluntary confession to the officers in great detail, as to his guilt of both of these crimes, the murder of the officer having been committed in Jackson County, Mississippi, and the robbery of the bank with a firearm in Mobile, Alabama. The appellant testified on the hearing as to whether or not the confession was free and voluntary, and made a token effort to contradict the testimony offered by the State in that behalf. The trial judge resolved the issue in favor of the State and there was ample testimony to support his finding.

There are about twenty grounds assigned for error by the appellant on this appeal, the principal ones being, first, that the trial court should have granted him a continuance of the case from the May Term of the court in Jackson County until the November Term thereof; second, that the trial court should have granted him a change of venue; and third, that the trial court should have granted a directed verdict in his favor on the ground of insanity at the time of the commission of the homicide: The other assignments of error will be hereinafter mentioned.

For a clear understanding of the issues presented on this appeal, and especially the three grounds hereinbe-

fore enumerated, it is necessary that we state the controlling facts in regard thereto.

It appears from the proof without much contradiction, and without any contradiction in many material particulars, that shortly after midnight on May 27, 1954, the appellant "thumbed a ride" in the automobile of one Evans J. Hale, a soldier in the Air Corps at Keesler Field, as the latter was leaving the City of Gulfport in his automobile; that enroute from Gulfport to Biloxi, the destination of the soldier, it was disclosed by a conversation between the soldier and the appellant that the former was from Pocatello, Idaho, and that the latter claimed to be from Salt Lake City, Utah, near where the soldier had resided; that the soldier inquired of the appellant as to what was going on in Salt Lake City, and was told by the appellant that a bank building was being constructed on a site in Salt Lake City where a big fire had occurred; and that the soldier who had worked until midnight at a radio station in Gulfport before leaving for the air base at Keesler Field in Biloxi, informed the appellant that the soldier's wife had given birth to a baby a few days prior thereto. These facts, as testified to by the soldier at the trial, become material upon the issue of the appellant's sanity or insanity, since the appellant recited the same details as to the conversation between him and the soldier, in the former's confession to the officers prior to the time that they were related by the soldier in his testimony at the trial, showing that the appellant remembered the details of what occurred on the night of the homicide. The appellant in his confession further corroborated the testimony of the soldier in regard to the fact that the soldier carried him to a place in front of the City Hall at Biloxi, and told him that that would be a good place for him to catch another ride on toward Mobile, where the appellant had stated he intended to go.

It further appears from the confession of the appellant to the officers after his arrest that he caught an-

other ride from Biloxi as far as Ocean Springs, where the police Officer Beaugez was on duty; that the appellant was waiting at the stop light in Ocean Springs when the said officer accosted him and asked for some identification; that the appellant claimed that he was unable to furnish the identification for the reason that he claimed to have been robbed; and that thereupon the police officer told the appellant that he would place him in the city jail at Ocean Springs to spend the remainder of the night, pending a check on the appellant's status, but subsequent events show that he evidently reasoned that it would be detrimental to his chances for remaining at large if he should permit the officer to thus detain him and ascertain that he was a parole violater from San Quentin Penitentiary, where he had been incarcerated three times.

It was further shown that when the officer failed to check in for the purpose of going off duty between six and seven o'clock on the morning of May 27th, the chief of police of Ocean Springs drove all over the town and could not find the police car anywhere on the streets; that according to the testimony of the chief of police he then decided to go to the city jail to investigate; that at the city jail he found the keys of the policeman Beaugez in an unlocked cell door, and then discovered the policeman's cap on the floor, and found blood on the floor and walls, and a glass window smashed; that the chief of police followed the blood stains out of the jail to where the policeman Beaugez usually parked his police car; and that he then observed that the car had been backed out from near the jail building and driven away. From this point a considerable portion of the remainder of the story is supplied by the confession of the appellant, and which clearly demonstrates his guilt of having committed the homicide beyond any reasonable doubt and to the exclusion of every other reasonable hypothesis; and that he was possessed of ample mentality to know the difference between

right and wrong when he committed the homicide in question and the armed robbery of the bank at Mobile.

The appellant's confession discloses that he had the police officer Beaugez drive the latter's car through the City of Pascagoula and then the town of Moss Point en route toward Mobile, and that when this officer drove near two policemen in Pascagoula and indicated that he was going to contact them the appellant threatened to kill the officer if he made any such further gesture; that en route from Pascagoula to the scene of the crime he informed his said captive that he was going to have to get rid of him; that the officer informed him that he was married and had a family and begged for his life as they were proceeding eastward toward Mobile; that after passing through the Town of Moss Point the appellant had the officer turn his car onto a dirt road and travel some two hundred yards from the paved highway, where he then caused the police car to be turned around and stopped; that the appellant then got out of the car from the side where he was sitting and had the officer get out on the same side; that thereupon he demanded that the officer remove his trousers and exchange trousers with him, which was accordingly done; that there was no disparity in the size of the two men; that the appellant was wearing blue denim (blue jeans) trousers and the officer was wearing the blue trousers of his police uniform; that after the exchange of trousers had taken place the appellant, who still had the pistol of the officer, caused the latter to march about eight feet ahead of him through the gate or cattle gap which crossed the dirt road; that while this was taking place the officer was looking back and begging for his life; that thereupon the appellant shot the officer in the left chest, and after the latter had fallen to the ground he walked up to his body and shot another bullet through his head. It was shown by the testimony of the investigating officers that this spent bullet was found on the ground underneath the head of the dead officer, and it was shown

by the testimony of a ballistics expert that this bullet was fired from the officer's pistol, which was in possession of the appellant at the time he was arrested, the same being identified by the record of its serial number kept by the chief of police at Ocean Springs; that immediately before shooting the officer the appellant says that he had thrown the officer's billfold to him, and it was shown by other testimony that this billfold was later found at the body of the deceased lying near his hand; that the appellant had failed to remove his own billfold from the pocket of the denim trousers that he had compelled the officer to put on before he killed him, and it was shown by other proof that this billfold contained some check stubs and other identifications showing the name of "Gerald A. Gallego," and that the denim trousers being worn by the deceased, but belonging to the appellant as aforesaid, contained a laundry mark "421," matching the laundry marks on some of the clothing which the appellant had admittedly left in a bundle in the jail at Ocean Springs after beating up the officer so as to compel him to drive the car eastward toward Mobile.

The witness Evans J. Hale, who had given the appellant a ride from Gulfport to Biloxi that night, testified that when he picked up the appellant he had a bundle in his hand which was wrapped in brown paper, similar to the bundle of clothing found by the chief of police of Ocean Springs in the jail after the appellant had made his escape therefrom.

From the scene of the crime the appellant says he drove the officer's car to Mobile and abandoned the same within the corporate limits of the city, and then went to the L & N Railroad Station there, where he remained until near the hour for the opening of the banks; that just before 9 o'clock, A. M. of the said 27th day of May the appellant got in a taxicab and had the driver thereof to take him to the First National Bank and wait for him on the outside; that upon entering that bank the

appellant decided that there were too many people in the bank at the opening hour of 9 o'clock for him to successfully rob the same without considerable risk of being captured at the scene; he had sense enough it seems not to take said risk and to return to the taxicab and have the driver to take him to the American National Bank and Trust Company and wait for him on the outside until he could rob that bank; that he presented a check at a teller's window, and then at the point of the officer's pistol he required the teller to give him money amounting to approximately $1,000.00, and $860.00 of which was found on the appellant at the time he was thereafter arrested; that thereupon the appellant returned to the taxicab and had the driver to take him to the L & N Railroad Station where he said he was going to catch a train for New Orleans; that en route to the railroad station the taxi driver agreed to carry the appellant to New Orleans in his taxi for a fee of $60.00, which was thereupon paid out of the loot from the bank, but without the taxi driver knowing that his passenger was a ruthless and remorseless killer and a robber.

The proof further shows that the taxi driver then went to the company's station to have his mileage checked before making the trip to New Orleans and to turn over the $60.00 fee that he had collected for the trip; that in the meantime a message had come over the radio in regard to the bank robbery, and as the taxi driver and the appellant drove away a mechanic at the taxi station realized that the passenger in the departing taxicab met the description of the bank robber according to the message he had heard over the radio; that the officers of Mobile were promptly notified and proceeded to alert the officers along the Mississippi Gulf Coast to be on the lookout for taxicab No. 158 in which the appellant was riding; that upon the arrival of the taxicab in the Town of Moss Point, the constable of the beat, who was also deputy marshal of the town, observed the number of this taxicab, then followed it, sounded his siren, and whereupon

the taxi driver pulled to one side and stopped; that the appellant then straightened up on the seat and faced the driver, evidently expecting this officer to approach the car on the driver's side; that the officer surprised the appellant by approaching the car on the side where he was sitting, drew his pistol on him, and effected his capture; that the officer thereupon took the pistol from the appellant with which he had murdered the police officer at Ocean Springs earlier that morning; that the officers of Pascagoula were thereupon notified and came promptly to Moss Point; that in the meantime the capturing officer had marched the appellant into a cafe, and when the officer turned his head to attract the attention of the Pascagoula officers, upon their arrival near the cafe and let them know where he and his prisoner were, the appellant ran, but was soon recaptured, handcuffed, and carried to the Jackson County jail; that when the appellant was being recaptured, after being disarmed as aforesaid, he began walking toward the officer who had recaptured him, saying ''Shoot me, I have got to die anyway''; that the officer kept telling the appellant not to come any nearer to him, and the appellant kept walking toward the arresting officer until he was told by the latter that if he took another step he would shoot him. This action of the appellant was evidently a ruse on his part to get near enough to the officer to disarm him, (just as he had done his victim in the jail at Ocean Springs), and upon the theory that the officer would not actually shoot him since the appellant was then unarmed. He had sense enough to stop when he determined that this officer meant what he said when he told him that if he came nearer he would shoot him.

After the appellant was placed in the county jail at Pascagoula, which was about 11:00 A. M. of May 27th, and before it had become known there that the body of officer Beaugez had been found a few minutes before in the side road east of Moss Point, he was given something to eat, allowed to take a long nap in the jail, and was

later interviewed by Sheriff Leo Byrd, Deputy Sheriff Cecil Byrd, and the District Attorney, Boyce Holleman, about 9 o'clock that night. In the meantime, the discovery of the body of Officer Beaugez had been made known. At the conference with the above-mentioned officers, the appellant made the full, free and voluntary confession in regard to the facts hereinbefore stated. He admitted before the trial judge, on the trial in the absence of the jury, that on the occasion of this confession no one made any promises to or threatened him, but he claimed that in the early afternoon of that day someone whom he did not identify had said, in substance, something about "We have ways and means of getting the truth when a person doesn't want to talk." However, he was contradicted by witnesses for the State as to this alleged threat.

Moreover, he does not contend on this appeal that he did not kill Officer Beaugez, and it is conceded by his counsel, who so capably defended him, that he did kill the officer as related in his confession, that it was not done in necessary self-defense, but that he should have been acquitted on the ground of insanity at the time of the killing. Such is his sole defense on this appeal, except he claims that he is entitled to a reversal of the conviction and death sentence on the further grounds that he was denied a continuance of the case until the next term of court, and that he was entitled to have had a change of venue for the trial; and other alleged errors are assigned which will be hereinafter referred to in this opinion.

Our only reason for stating in detail the testimony hereinbefore set forth is to show that all of the incidents which occurred on the night of the killing have the effect of clearly disclosing that appellant was not insane at the time of the homicide. We have hereinbefore called attention to the fact that in his confession to the officers on the same day of the homicide, he remembered all of the details of his conversation with the soldier who gave him a ride from Gulfport to Biloxi and all of the incidents in connection with what transpired at the jail

at Ocean Springs, then en route to and at the scene of the crime, and also in connection with his robbery of the bank at Mobile, Alabama. He did make a mistake, however, in leaving his billfold in the pocket of his trousers that he compelled Officer Beaugez to put on, but this mistake was evidently made on account of momentary forgetfulness to remove his billfold from the pocket of his trousers before he compelled his intended victim to put them on.

The application for a continuance of the case for the term was based on the fact that the circuit court convened at Pascagoula on May 17, 1954, and that he was being tried at that same term of the court; that due to the news items appearing in the public press on May 28, 1954, in regard to the homicide and the bank robbery, the same had the effect of causing the public in Jackson County to prejudge his case; that these news items appeared in the Mobile Register and the Mobile Press at Mobile, Alabama, The Moss Point Advertiser in Jackson County, The Times Picayune in New Orleans, and the Daily Herald at Gulfport and Biloxi in Harrison County, which gave in detail most of the facts hereinbefore stated; that the indictment was returned on May 27, 1954, the attorney for the defense appointed on May 28, 1954, the defendant arraigned on May 31, 1954, and he was tried on June 9th and 10th, 1954, without sufficient time being allowed the defendant according to his contention, to obtain certain alleged records from California bearing on the question of his alleged insanity; and that the trial was held too near the date of the homicide when public feeling and excitement was still aroused by the killing of a popular and highly esteemed police officer.

As to the newspaper items, the jurors who may have read them only received such information as was later given them under oath at the trial. We have carefully read all of these news items which were made exhibits to the application for a continuance and we find that the facts therein contained were fully established by the confession of the defendant and by the sworn testimony of

the witnesses in the case at the trial. The State intro-
duced a number of witnesses, including members of the
board of supervisors and other county officers, who tes-
tified that in their opinion the defendant could get a fair
and impartial trial at that term of court, and that a jury
could be obtained that would base their verdict solely
upon the testimony at the trial as to the facts of the homi-
cide, there being no dispute as to the identity of the per-
son who committed the homicide in question and there be-
ing no plea of self-defense interposed, it being conceded
that the sole defense of the accused was that he was in-
sane at the time of the commission of the crime, *and
there is not a scintilla of evidence in this record to in-
dicate that any prospective juror had prejudged that is-
sue.* A newspaperman testified that he thought it would
be rather difficult for the defendant to get a fair and im-
partial trial at the then current term of court.

The defendant was represented by an attorney ap-
pointed by the court who, although he had not had much
experience in the courts, did not fail to raise and fully
preserve every conceivable point that could have been se-
riously urged under this record. He represented the de-
fendant ably and well; he did a splendid job in the cross-
examination of the State's witnesses, in the preparation
of the instructions on behalf of the defendant, and in his
argument to the jury, which was transcribed and appears
in the record before us.

The trial judge was fair and impartial, and he saw to
it that no juror served on the panel who had any doubt
in regard to being able to disregard what he had read
about the case, and try the defendant on the testimony
given from the witness stand. The district attorney, al-
though developing the testimony and prosecuting the
case with conspicuous ability, was exceedingly fair, and
took no undue advantage of the accused, either in the
presentation of the evidence or his argument to the jury.
It is conceded in the briefs of counsel that he and the
sheriff of the county raised a fund for the expense nec-

essary to enable the defendant's mother to come from Hawthorne, California to Pascagoula, Mississippi, to testify as to the life story of the accused on the question of whether he was sane or insane, she and the accused being without means to otherwise defray the expense of her transportation.

As to the lack of time for the accused to obtain certain court records in California bearing upon the issue of his mental status in the past, *it was not shown that there were any such records in existence;* and, moreover, if there were such court records, there was sufficient time intervening between May 28th and June 9th within which certified copies thereof could have been obtained for introduction at the trial. The mother of the accused was allowed, without much interruption, to give considerable hearsay and other incompetent testimony on behalf of the accused on the issue of alleged insanity, and as to when and where he had served prison sentences. His life story, as related by her, merely disclosed that he began his life of crime as a juvenile delinquent and has continued in a career of crime up to the present time. The defendant introduced two other witnesses on this issue of insanity, neither of whom gave any testimony of probative value.

 On the application for a change of venue, it is a matter of common knowledge that when such an application is granted the case is transferred to another nearby county for trial, since the county where the crime is committed is to bear the expense of the attendance of the State's witnesses and of the entire trial elsewhere. The newspapers hereinbefore mentioned have a general circulation in the adjoining counties, except that the circulation of the local newspapers referred to as being published in Jackson County would probably have been confined largely to that county; and therefore the news items complained of as appearing in the other newspapers heretofore mentioned would naturally have been read by the general public in each of the nearby counties

in regard to such a willful, brutal, remorseless, and callous murder of a peace officer as was detailed in such news items under the conspicuous headlines of the papers wherein they were published.

 Moreover, the matter of granting a change of venue is within the sound discretion of the trial judge. Shimniok v. State, 197 Miss. 179, 19 So. 2d 760; and Wheeler v. State, 63 So. 2d 517 (Miss.). The first of these cases involved the murder of a popular ex-sheriff in the county where the case was tried, and the other two peace officers in the line of duty. Both crimes were committed by strangers in the counties of the venue. We upheld the trial court in its denial of a change of venue in each case. This Court is not justified in reversing a case because of the refusal of a trial judge to grant a change of venue unless it clearly appears that there has been an abuse of the discretion vested by law in the trial judge.

In the instant case we find that the first 270 pages of the record before us are consumed with hearings on the motion for a continuance and for a change of venue, together with the voir dire examination of the jurors, in a painstaking effort on the part of the trial judge not to abuse his discretion in the action taken on either of the motions, and in seeing to it that a fair jury was impanelled to try the case.

 As to whether a continuance should have been granted, Section 2518, Code of 1942, reads in full as follows: ''All indictments shall be tried at the first term, unless good cause be shown for a continuance.'' This Court held in the case of Newell v. State, 209 Miss. 653, 48 So. 2d 332, that under Section 1520, Code of 1942, the ''granting of a continuance is a matter largely within the discretion of the trial judge and that refusal of a continuance will not be grounds for reversal unless that discretion has been abused and the Court is satisfied that injustice has resulted therefrom. McDaniel v. State, 8 Smedes & Marshall, 16 Miss. 401, 47 Am. Dec. 93; Cox v. State, 138 Miss. 370, 103 So. 129; Jones v. State, 168 Miss.

702, 152 So. 479; Hodgkin v. State, 172 Miss. 297, 160 So. 562; Allgood v. State, 173 Miss. 27, 161 So. 756; Ellis v. State, 198 Miss. 804, 23 So. 2d 688; Cody v. State, 24 So. 2d 745; Jackson v. State, 199 Miss. 853, 25 So. 2d 483; Parker v. State, 201 Miss. 579, 29 So. 2d 910; McGee v. State, 40 So. 2d 160, not yet reported in the State Reports, appeal dismissed and certiorari denied 338 U. S. 805, 70 S. Ct. 77, 94 L. Ed. ............''

We are of the opinion that under this record no juror at any term of court to be held anywhere, who has truthfully qualified for jury service as having no conscientious scruples against capital punishment in proper cases, could have reached any other verdict than that which was rendered in the instant case. The writer of this opinion would not be willing as a juror to vote for the death penalty other than in exceptional cases, but unless capital punishment is to be inflicted in a case such as this, then the recent installation of the $10,000 lethal gas chamber at the State Penitentiary would have been an injudicious expenditure of public funds.

 The appellant further contends that the court should have adjourned during the midafternoon of the last day of the trial until the next morning so that he could procure the attendance of a psychiatrist from Mobile, Alabama, to examine him and testify as to his mental capacity, but his counsel conceded that he did not know what this psychiatrist would testify to even if the court had recessed until he came. The State had procured the attendance of the superintendent of the State Insane Asylum and of a member of his medical staff, each having had considerable experience in the study and treatment of mental cases, and they had obtained from the defendant's mother his life history and had examined him for more than an hour and they were available to either the State or the defendant to testify on the issue of whether or not the defendant knew right from wrong at the time of the commission of the crime, which occurred approximately two weeks prior to the trial. The

member of the superintendent's staff was still present at court up to the time the defendant rested his case, and was in fact introduced by the State in rebuttal; and his testimony is clear and convincing that the defendant was sane.

The superintendent of the State Insane Asylum could have been required to remain to testify in the case on that issue if the defendant had so desired. Moreover, there was no proof whatever on behalf of the defendant that he was either insane or did not meet the legal test of knowing right from wrong at the time of the commission of the crime. Nor was it shown that there were any court records in existence, as aforesaid, or that any oral testimony would ever be available to show in reality that the defendant did not know right from wrong and fully appreciate the nature and character of his conduct in connection with this homicide. In our opinion the trial court was fully warranted in proceeding with the trial of the case to completion on the afternoon when the request was made for the recess until the next day when it was said the attendance of the non-resident psychiatrist could be obtained.

On the question of whether or not the defendant should have been tried as early as June 9th and 10th, after his indictment on May 27th, the appointment of his counsel on May 28th, and his arraignment on May 31st, see the case of Newell v. State, supra, and other decisions of our Court therein cited. See also (Thirteen days.) Powell v. State, 141 So. 201, 224 Ala. 540, certiorari granted Powell v. State of Alabama, 52 S. Ct. 648, 286 U. S. 540, 76 L. Ed. 1278, reversed on other grounds Powell v. State of Alabama, 53 S. Ct. 55, 287 U. S. 45, 77 L. Ed. 158, 84 A. L. R. 527; Commonwealth v. Schurtz, 14 Northumb. L. J. 165 (Pa.) (eleven days.) State v. Brewer, 254 N. W. 834, 218 Iowa 1287, (Other decisions see 16 C. J. p. 450, note 68 (a)); (Six days.) McAdams v. State, 114 So. 39, 216 Ala. 659; Carter v. State, 234 S. W. 535, 90 Tex. Cr. 248; (Five days.) State v. Schemp, 133 So.

738

367, 172 La. 72; (Three days.) Holmes v. State, 42 S. W. 996, 38 Tex. Cr. 370; (One day.) Commonwealth v. Donnelly, 5 Pa. Dist. & Co. 657, affirmed 86 Pa. Super. 427; (Same day.) People v. Scigliano, 194 Ill. App. 345; (Fourteen days.) Polite v. State, 78 Ga. 347; (Thirteen days.) Jarvis v. State, 156 So. 310, 115 Fla. 320, error denied 160 So. 366, 118 Fla. 577; (Twelve days.) Milligan v. State, 94 So. 169, 208 Ala. 223; (Nine days.) Commonwealth v. Lockard, 188 A. 755, 325 Pa. 56; (Six days.) Greer v. State, Cr., 105 S. W. 497 (Texas); (Five days.) McAdams v. State, 114 So. 39, 216 Ala. 659; (Four days.) State v. Wiggins, 175 So. 751, 188 La. 64; (Three days.) Roberts v. State, 72 So. 649, 72 Fla. 132; (Two days.) Kelloy v. State, 107 S. E. 488, 151 Ga. 551; State v. Griffin, 82 S. E. 254, 98 S. C. 105, Ann. Cas. 1916D 392; (One day.) Brown v. State, 156 So. 606, 116 Fla. 587; Other decisions see 16 C. J. p. 450, note 69; (Twelve days.) Reynolds v. State, 61 P. 2d 269, 60 Okl. Cr. 92; (Eleven days.) Milligan v. State, 94 So. 169, 208 Ala. 223; (Nine days.) State v. Lund, 31 P. 146, 49 Kan. 580; (Three days.) State v. Schemp, 133 So. 367, 172 La. 72; (Seven months.) State v. Showen, 199 P. 917, 60 Mont. 474; (Three weeks.) Scott v. State, 233 P. 776, 29 Okl. Cr. 324; (Fifteen days.) Carsons v. Commonwealth, 47 S. W. 2d 997, 243 Ky. 1; (Three days.) Collins v. State, 240 P. 135, 32 Okl. Cr. 136; and (Four days.) Jarvis v. State, 156 So. 310, 115 Fla. 320, error denied 160 So. 366, 118 Fla. 577. However, there are some decisions to the contrary cited in the Note in 22 C. J. S., Sec. 478, at p. 735, from other jurisdictions.

 Finally, it is urged that the defendant was not allowed sufficient time to prepare a motion for a new trial before the court adjourned; that an hour and fifteen minutes was insufficient for that purpose. It would seem that there was nothing complicated about the preparation of a motion for a new trial on this record; one should not necessarily have been of greater length than the motion which was prepared for time to prepare the

proposed motion for a new trial. Since the jury was ready to be discharged, it would have been proper to have kept the court minutes open until the next morning to allow all the time wanted for preparing and arguing such a motion, but looking back over the entire record, we are of the opinion that there is nothing in it that would have justified the granting of a new trial, if such a motion had been made, and it was not suggested on behalf of the defendant that there was any new matter that was desired to be set forth in such a motion. Therefore, we do not think it was reversible error, if error at all, to fail to grant more time.

Nor do we think there was error in the granting or refusing of instructions, or as to the other alleged errors complained of.

This case has been considered by all nine Members of this Court, as is customary where the death penalty has been fixed by the verdict of a jury, and we are unanimously of the opinion that the conviction and sentence of the defendant should be affirmed.

Affirmed, and Thursday, March 3, 1955, is hereby fixed as the date for the execution of the death sentence in the manner provided by law.

All justices concur.