REGISTER *v.* STATE.

No. 41168 June 8, 1959 112 So. 2d 523

*James H. Colmer*, Pascagoula, for appellant.

*G. Garland Lyell, Jr.*, Asst. Atty. Gen., Jackson, for appellee.

RoberDS, P. J.

Register was indicted for and convicted of the crime of burglary of a dwelling house with the intention to steal personal property contained therein. On this appeal he contends (1) that the indictment was fatally

defective in that it did not aver the name of the owner of the personal property which Register intended to steal and take away, and (2) that the verdict of the jury was against the great weight of the testimony and (3) that the court committed fatal error in admitting two confessions made by Register.

On the first contention the indictment charged burglary with the intent to steal. It did not charge larceny of any of the personal property located within the dwelling. In such case it is not necessary that the indictment shall specify the owner of the property intended to be stolen. It is sufficient to charge a burglarious breaking and entering for the purpose of stealing therein. Brown v. State, 72 Miss. 992, 18 So. 431; Fournier v. State, 96 Miss. 417, 39 So. 302; James v. State, 77 Miss. 370, 26 So. 329; 9 Am. Jur., Burglary, Sec. 52.

On the question of the weight of the evidence the testimony offered by the State may be summarized in this manner:

The house burglarized was the property of Mrs. Georgia McCollum. Mrs. McCollum and Miss June Flowers (now Mrs. Leslie) were sleeping in separate rooms in said building. Miss Flowers was attacked by some man. He undertook to choke her to death by winding around her neck a pillow case. He also hit her in the head with a hammer. Her wounds were very severe and she was in the hospital several days. The party also stole from her purse in the room $10 in money. Her screams caused him to run from the house. Mrs. McCollum was awakened by these screams and she saw the intruder as he ran from the dwelling. Both of these witnesses hesitated to say positively that Register was the attacker but both of them did describe certain physical aspects, such as black curly hair, protruding chin, and his profile—all of which physical personal characteristics corresponded with characteristics and profile of Register. They also

identified a shirt which was being worn by the attacker and which was introduced in evidence. Photographs of Register were introduced in evidence and the jury had the right to conclude from the testimony of these two ladies that the man who attacked Miss Flowers was Register himself.

It was further shown in the evidence that the officers gathered from the sheets on the bed on which Miss Flowers was attacked human hair. These hairs along with hair from the body of Register were sent to Dr. Nelson E. Grubbs of Mobile, Alabama. Dr. Grubbs was a toxicologist with much experience in the matter of scientific investigation of evidence in criminal cases. The officers also carried to him the two pillow cases and bedsheets and the bedspread which were on the bed when the crime was committed. They also sent to him a shirt which the officers had taken from the room occupied by Register and which he admitted was his shirt. Dr. Grubbs, after a very thorough scientific investigation, concluded that the hairs on the sheets were very similar to those on the body of Register. He also carefully examined certain metallic particles which were lodged in the fabric of the shirt. The day before the crime was committed, Register had worked at a manufacturing plant called Thicol Chemical Corporation. He was using a wire brush cleaning the metal and paint from the metal sashes of an office building of said corporation. The brush was composed of wire and in its use there was embodied in it and blown onto the shirt then being worn by Register certain metal particles and metallic paint. This shirt was also sent to Dr. Grubbs. Dr. Grubbs, although stating that no two hairs of the human body were exactly alike and that the scientific investigation of such hairs would not be conclusive, said: "I found the hair from the bed and the hair of the head labeled Register to be similar in all respects." He also stated positively that the metallic particles which were embedded into Regis-

ter's shirt were exactly the same as the particles which had been scraped by Register from the building of Thicol Chemical Corporation at which Register was at work the day before this crime was committed.

In addition to the foregoing, it was shown by the State that Register gave two written confessions. In these two confessions he not only admitted he committed the crime but he detailed how it was accomplished and his excuse for so doing according to the written confessions, was that he regretted that he had been guilty of the commission of the crime.

It appears from the evidence that Register had been convicted of numerous crimes in various parts of the United States. Some of these were felonies. He had paid many fines and on a number of occasions had served in penal institutions. He himself estimated he had been convicted some forty or fifty times.

His defense in this case was an alibi. He contended that on the night of the crime he had spent that night in an automobile with three other persons on or near the beach adjoining the Gulf of Mexico in Mississippi. He introduced some witnesses who undertook to testify to that fact. We will deal with the testimony.

Mr. Harry D. Hammond testified that he lived a short distance from Mrs. McCollum; that the hammer used in striking Miss Flowers in the head belonged to him; that it was in his garage.

Mrs. Dana Farragut, placed on the stand by Register, was a nurse at the Jackson County Hospital on April 17, 1957, the night Miss Flowers was carried to the hospital. She said Miss Flowers was placed in the emergency room and that she, the witness, talked to Miss Flowers about the attack. Mrs. Farragut testified that Miss Flowers told her that some man was trying to choke her to death with a pillow case and that she thought it was a man of light color and of the negro race. Mrs. Farragut said that Mrs. McCollum and Mrs. Vice, a

nurse, were present when Miss Flowers made the fore-going statement.

Mrs. Frances E. Harris testified that she lived on Front Street in the City of Pascagoula, Mississippi; that she knows Mr. Register and that on the night of the attack Register was at her cabin until between 11:30 and 12 o'clock. He left and she does not know where he went. Register was related to her by marriage.

Mrs. Lucille Poole Cook testified that she worked at a coffee shop in Pascagoula and that she is the daughter of Mrs. Harris. Her testimony would have justified a conclusion that at the time this crime was committed Register was at another place. However, it developed that she had given a written statement which in this material respect contradicted her testimony upon the stand. She said that when she gave that written statement she was nervous and mixed up; that she had had more time to think and that the statement she gave was incorrect. She admitted that she had signed it and admitted that the officers did not threaten or induce her to sign it. She was uncertain as to whether the night she had in mind was Wednesday night or Friday night.

Merley M. Herndon said he was with Miss Cook and Mrs. Harris and Register. The jury might have concluded from his testimony that Register was not present at the McCollum home when the crime was committed, but he, too, had signed a written statement which contradicted the other testimony he gave upon the stand to the effect that Register was at some place other than the McCollum home at the time the crime was committed. He admitted he gave the statement and signed it and that no threats were made or inducement offered to him to sign it. He said he had changed his statement because he had thought about the facts and that his written statement was wrong. He admitted he had told a falsehood in his written statement as to the night he and others spent on the beach with Register. He was

asked if each time in the past, including the written statement, he had not placed himself and the other parties on the beach on Thursday night instead of Wednesday night when the crime was committed and he answered: "Yes, sir." He was asked this question: "Did you lie to them when you gave this statement?" His reply was: "Yes, sir." He was further asked: "You told them a lie—signed your name to a lie, is that right? A. Yes, sir."

In rebuttal the State introduced Mrs. Claude Vice. She was a nurse at the Jackson County Hospital when Miss Flowers (Mrs. Leslie) was brought to the hospital. Mrs. Farragut had testified that Mrs. Vice was present when Miss Flowers said she was attacked by a negro. Mrs. Vice testified she was present and then said: "I didn't hear the word negro mentioned." Defendant had also introduced testimony that Mrs. McCollum had made a like statement. Mrs. Vice was asked if Mrs. McCollum made the statement and she replied: "Not to me. She didn't make no such statement. I didn't hear that word mentioned."

The State then introduced the hospital records showing the nature and extent of the injury suffered by Miss Flowers resulting from her physical contest with her attacker and as a result of being struck in the head with a hammer.

The State also introduced in rebuttal Dr. Carl Horne, who described the wounds and injuries received by Miss Flowers.

The State recalled Mrs. McCollum who said she was present in the room in the hospital with Mrs. Vice and Miss Flowers and she never heard Miss Flowers make the statement attributed to her by Mrs. Farragut.

We have not tried to give in detail all of the testimony both for the State and for the defendant but what we have given is in substance the testimony relevant to the pertinent facts of the case.

The jurors heard the testimony and saw the demeanor of the witnesses when they testified. It is clear, we think, that this testimony amply justified a verdict of guilty at the hands of the jurors who tried this case.

On the third contention—the admissibility of the two confessions made by Register—we think it is sufficient to say that timely objection to the introduction of the two confessions were properly made and that the court excluded the jury and heard testimony as to whether the confessions were free and voluntary. The first statement was given to I. N. Riley, a highway patrolman. He testified that no threats were made, no inducement offered, and that the statement was made freely and voluntarily. Register said that when he gave Riley the statement that only he and Riley were present. He said that Riley did not strike or threaten him or make him any promise; that Riley was nice to him and Riley wrote out the statement and he signed it; that Byrd, deputy sheriff, came to the door of the room while he and Riley were talking but he does not claim that Byrd made any threat or offered any inducement to him to sign the statement.

He admitted on examination by the district attorney that the description in the written statement of most of the essential facts was correct. His only excuse for signing the statement was he said he was scared.

The other written confession was made in the presence of five parties. It was in substance the same as the statement just discussed. He stated that he broke into the McCollum house through a window. He admitted that and then the statement recites: "The next thing I knew I was in a house choking a girl. She was screaming and fighting with me. I hit her with a hammer and started out of the house. As I left her room I saw someone else in the house. I went out by the other person and jumped through the window. After I got out of the house I went back to my room. I had a brown billfold that I

took out of the house where I was choking the girl. I took the money out of it and put it in my billfold. The next afternoon I went out to Bayou Cumbest and threw the girl's billfold into the water.

"I have read the above statement and it is true and correct to the best of my knowledge. /s/ James E. Register."

Register testified that this statement was given by him in the courthouse; that one of the witnesses to the confession hit him on the head, in the stomach and on the throat with his open hand.

Four of the attesting witnesses to this statement testified that no inducement was offered and no threat was made and that the statement in question was free and voluntary.

It will be noted that there were two written confessions and the witness did not contend that the confession to Mr. I. N. Riley alone was induced by threats or inducements of any type. It is significant that this confession contained this statement: "I was in the house in room with girl, I was choking her. She got loose and was getting up and I hit her with hammer. Do not know where I got hammer. Was too drunk to know how I got in house. When I hit the girl I went out of through window. I saw someone else in house, I do not remember where they were. The first think that I can remember good was out in the street. I do not what street it was. But I went to my house on Welch Street and sat down and drunk what vodka I had left and lay down and went to sleep.

"I do not know why I did, other than I needed money. When I get to drinking, I can navigate but my mind won't work. I do think that I definitely would not do if I weren't drinking.

"All that I can say is that I am sorry, that would not have done it if I had not been drinking.

"The statement that I made to Mr. Riley is true and correct to the best of my knowledge.

"I know that I can be used in court for or against me. /s/ James E. Register."

As stated, we do not find from the record that Register claims that the confession to Riley was the result of threat or violence or inducement. In any event it was within the province of the jury to say whether the statements were free and voluntarily given.

The questions pertaining to the admissibility of confessions are discussed in the following recent cases. Parker, et al v. State, 194 Miss. 895, 13 So. 2d 620; Criss v. State, 202 Miss. 184, 30 So. 2d 613; Peacock v. State, (Miss.), 42 So. 2d 232; Pulliam v. State, (Miss.), 45 So. 2d 578; Clark v. State, 209 Miss. 586, 48 So. 2d 127; Ray v. State, 213 Miss. 650, 57 So. 2d 469; Gallego v. State, 222 Miss. 719, 77 So. 2d 321.

■ ■ The rule is deducible from these cases that where the evidence on the admissibility of a confession is conflicting the trial court's finding will not be disturbed on appeal unless it appears to be clearly contrary to the evidence. ■ ■ In the case at bar the great preponderance of the evidence supports the finding of the trial judge.

Affirmed.

*Hall, Holmes, Ethridge,* and *Gillespie, JJ.,* concur.