# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00630-COA

| | |
|---|---|
| IN RE THE ESTATE OF JANICE WILLIAMS, A/K/A JANIE WILLIAMS, DECEASED: IRENE WILLIAMS, ADMINISTRATRIX | APPELLANT |

v.

| | |
|---|---|
| DORIS BRYANT | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 09/23/2022 |
| TRIAL JUDGE: | HON. CRYSTAL WISE MARTIN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | GREGORY J. WEBER |
| ATTORNEY FOR APPELLEE: | THOMAS McCARLEY BRYSON |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 02/13/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Janice Williams ("Janie") died on August 13, 2015, leaving a last will and testament dated March 16, 2013 which left her entire estate to her niece Doris Bryant. That will was admitted to probate. Irene Williams, Janie's sister, contested the will, claiming that it was the product of undue influence by Doris. The chancery court found that although there existed a confidential relationship between Doris and Janie, there was no abuse of that relationship that would create a presumption of undue influence. Irene now appeals, arguing the chancellor erred because there were suspicious circumstances surrounding the will's execution sufficient to raise a presumption of undue influence. Irene further argues, given

this presumption, that the burden shifted to Doris to prove good faith and that Doris failed to meet this burden. After review, we find that the chancellor applied the correct legal standard and that there was substantial evidence to support the chancellor's findings of facts. We find no abuse of a confidential relationship and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Janie was born in Mississippi but moved to New York as an adult. While in New York, Janie maintained relationships with her family members back in Mississippi, often returning to visit during holidays. During these visits, Janie typically stayed with her parents, but after their passing, she stayed with other members of her family. According to the undisputed testimony, Janie treated Doris "like a daughter." In fact, on August 9, 2007, Janie named Doris as the primary beneficiary of her Roth IRA account with Vanguard.[1]

¶3. In 2011, Janie's health declined, and she was hospitalized. While in the hospital, Janie decided she wanted to return to Mississippi to be with her family. Her family members began communicating with social workers in order to arrange for Janie to be picked up from the hospital and brought back to Mississippi. Doris and her sister Debra Williams, along with Janie's sister and brother (Inez Williams and Ernest Williams, respectively) made plans to travel to New York together to pick up Janie from the hospital and to relocate her to Mississippi.[2] There is dispute in the record as to what transpired leading up to and during

---

[1] By the date of Janie's death, August 15, 2015, this account had accrued a total value of $55,348.06.

[2] The testimony indicates these individuals took several trips to New York to help Janie pack before she ultimately flew to Mississippi with Debra in January 2013.

this trip to New York. Ultimately, Inez, Ernest, and his wife Elizabeth rented a truck and drove to New York without Doris or Debra. Upon their arrival, they picked Janie up from the hospital. Doris and Debra drove up separately and were waiting at Janie's home when Inez, Ernest, Elizabeth returned with Janie. Inez, Ernest, and Elizabeth left New York shortly thereafter, while Doris and Debra stayed to help Janie prepare for her move to Mississippi. While they were there, Janie was admitted to the hospital again, so Doris and Debra returned to Mississippi. Debra ultimately flew to New York and brought Janie back with her by plane in January 2013.

¶4. There is a dispute by the parties as to who Janie was originally intended to live with in Mississippi, but Janie ultimately moved in with Doris and her "lifetime partner" Melvin Gray. While Janie lived with Doris, Janie remained largely independent, but she relied on Doris and Melvin for transportation and to prepare meals.[3] Additionally, Janie had Doris listed as a co-owner of her bank account, which she opened shortly after her move to Mississippi. On March 18, 2013, Janie executed her last will and testament. Although Melvin and Doris drove her to the lawyer's office, they did not enter the office with her. The will's execution was witnessed by two disinterested individuals who worked at the lawyer's office.

¶5. The last will and testament, dated March 18, 2013, directed that all tangible personal property and the rest, residue, and remainder of property and estate, both real and personal, go to Doris alone. The will further appointed Doris as executor and, in the event Doris failed

---

[3] She could not cook over a stove as she required supplemental oxygen from an oxygen tank at all times.

to qualify as executor, appointed Melvin. The will was signed by Janie in the presence of two witnesses and notarized.

¶6. On May 20, 2013, Janie designated Doris as the primary beneficiary of her traditional IRA account with Vanguard.[4] Janie died on August 13, 2015, in Doris's home in Hinds County, Mississippi. Janie was unmarried and had no natural children.

¶7. On September 18, 2015, Irene filed a "Petition for Letters of Administration and to Compel Production of Last Will and for Other Relief." In the petition, Irene requested she be appointed administratix of Janie's Estate. On October 12, 2015, the chancery court entered an order opening the administration of Janie's Estate and appointed Irene as administratix. On December 12, 2015, Doris offered for probate an instrument purported to be the March 18, 2013 last will and testament.

¶8. On December 24, 2015, Doris filed her answer and counter-claim or an alternative motion to admit a will to probate and appoint an executrix. On January 22, 2016, Irene filed her answer and counter-claim for caveat and a request for a will contest, alleging that the purported Last Will and Testament was the product of undue influence of Doris.[5]

¶9. A trial was held from August 6 to 7, 2019. Doris first called Irene Williams as an adverse witness. Irene is Janie's older sister and contested the will Doris offered for probate in this matter. Irene testified that Janie resided in Plainview, New York, for "[n]ear 40 years"

---

[4] By the date of Janie's death, this account had accrued a total value of $230,721.70.

[5] On January 30, 2017, this case was consolidated with another action styled *Irene Williams, Individually and in re: Estate of Janice Williams, sometimes known as Janie Williams, Deceased, Irene Williams, Administratrix v. Doris Bryant* in the Hinds County Chancery Court for the First Judicial District in case number 2015-cv-1742.

4

and that she was employed as a caregiver for the Henderson family. During the forty years that Janie lived in New York, Irene stated she visited her "[o]ne time." Janie returned to Jackson often to visit "[u]sually around Christmas[,]" and she would stay "with[their] parents." After the death of their parents, Janie stayed with "[their] sister, Earnestine."[6] Irene testified that after Earnestine passed away "around" 10 years ago, she did not "recall Janie coming after then." She further stated there were Christmases when Janie did not visit at all as her "health was failing." Irene maintained that she nevertheless "talked to Janie on the phone often." However, once Janie moved into Doris's home, these phone calls "decreased drastically." Irene testified that during these phone calls Janie told Irene "she was very unhappy" and "wanted to move in with [their] brother." Irene testified that Janie "clearly understood where she was" and said, "Yes," when asked if "she could clearly express her opinions to [Irene]."

¶10.    Irene testified that Janie had "had two surgeries. One was heart surgery and . . . the other one was a hysterectomy." Janie was also diagnosed with "COPD" and "congestive heart failure." Irene recalled Janie was "in and out of medical facilities." Irene visited her at these facilities and stated, "at times . . . she seemed coherent and okay. And at times, she didn't." The trial court asked Irene if Janie was "capable of going to the bank, going to the grocery store and paying her own bills[,]" and Irene responded, "Yeah." Irene went further to explain that she ran into Janie "in Walmart" and "didn't see anybody with her." According

---

[6] Later testimony suggests that Janie would stay with her sister, "Catherine," not "Earnestine."

to Irene, "Janie basically took care of herself." Irene stated she never visited Janie at Doris's home. Irene did not attend Janie's funeral.

¶11. Next, Doris called Ms. Inez Williams as an adverse witness. Inez was Janie's sister. Inez testified she recalled visiting Janie in New York. On one occasion, sometime "before 2012[,]" she traveled with Doris and stayed in New York for one week. During this visit, Inez recalled Janie talking "about how she was going to do her will."[7] Janie indicated "[s]he was leaving stuff to her sisters, but she wasn't going to omit [Doris] out of anything." When Inez and Doris left, they brought Janie's "suitcase" and a "wicker basket full of [Janie's] stuff" and brought them back to Mississippi, storing some of it at Inez's home and some of it at Doris's home. On another occasion, Inez "went with [her] brother and his wife[,]" and "[Doris] and her sisters also went because [Janie] was getting ready to move back home." During this visit, Inez stated, "[Ernest] had rented a truck because he was planning on bringing some of [Janie's] stuff back [to Mississippi], but [Janie] was in the hospital when we got there. She was sick." Inez further testified that "[she] thought after [Janie] came [to Mississippi] that [Janie] was going to stay with [Inez]. But that changed."[8]

¶12. Inez stated that once Janie moved back to Mississippi, Janie never came to visit Inez because "[Janie] wasn't driving herself[,]" and she believed Doris wouldn't drive Janie to Inez's house "because at the time, for some reason, [Doris] wasn't talking to [Inez]." Inez never went over to Doris's house to visit Janie. Nevertheless, Inez talked to Janie over the

---

[7] Doris denied any recollection of this conversation.

[8] The record indicates Janie moved in with Doris immediately upon her move to Mississippi.

phone "practically every morning." Inez recalled Janie telling her that Doris purchased a cell phone for Janie. During these conversations, Janie "seemed to be able to take care of herself." These "daily" phone calls between Inez and Janie continued until Janie "got sick" and was hospitalized.[9] Inez stated she learned of Janie's hospitalization from other family members.[10] Inez stated she and the other siblings went to the hospital to see Janie but were prevented from doing so because hospital personnel were "told that [Janie] didn't have any other relatives."

¶13. After Janie was released from the hospital, Janie continued to call Inez every morning "like she always did[.]" Inez felt that Janie "made good sense" in their conversations. Inez "assumed [Janie] was being taken care of [by Doris and Melvin]." Finally, Inez testified that, at one point, she had asked Janie if she signed a will, and Janie told her "she hadn't signed anything." Janie never mentioned the will to Inez.

¶14. Wilbur Stacey Green testified next. Stacey's mother, Catherine, who was deceased, was Janie's sister, making him Janie's nephew. Stacey testified that he lived in Mississippi before moving to California in 1989. When Stacey lived in Mississippi, he had occasion to frequently interact with Janie. Janie "spent a lot of time with [his] mother" and "stayed with" his mother when she came to visit for holidays. In fact, Christmas was often hosted at his mother's home. After Stacey moved to California, he continued to visit Mississippi for "quite a few" Christmases when Janie was also visiting. Additionally, Stacey and his wife

---

[9] This is referring to the hospitalization that occurred in February 2013.

[10] The record indicates it was "Stacey" who informed Inez of Janie's hospitalization.

7

visited Janie when she lived in New York. Stacey testified he had a "very good" relationship with Janie. Stacey described Janie's "mental acuity" as "very sharp." He recalled that Janie's favorite baseball team was the Mets and that she collected dolls. He described Janie as "[v]ery astute of what was going on at the time."

¶15. Stacey testified that when Janie moved back to Mississippi, he continued to see her anytime he was visiting. Stacey observed that Janie "was quite ill" but "took care of her own affairs" and "took care of everything for herself." Stacey observed that Janie did not have much "contact" with her other siblings. During one conversation, Janie told Stacey she was "thankful because her nieces . . . were taking care of her[.]" She was "disappointed that she didn't hear from her brothers and sisters." Stacey recalled "there were times [he] he would hear from [Doris,] and she would say, '[W]ell, you're the only one asking about her[,]'" suggesting that the "sisters and brothers were not [asking about Janie]." Stacey testified that while Janie was in the hospital, she told Stacey that she wanted to see her siblings. Stacey testified he informed the other siblings that Janie was in the hospital. When the siblings came to the hospital, the "first thing they asked about was her affairs. Not how she's doing, what's [been] going on with her[.]"

¶16. Sara Ellison, one of the witnesses who witnessed Janie signing her will, testified next. Ellison testified that she worked in a CPA office in the same building as the law firm that worked for Janie. On the day of the will's execution, March 18, 2013, Janie's attorney asked Ellison to witness Janie's signature. Although Ellison did not specifically recall the exact encounter "because we did so many[,]" she testified that this was standard practice with the

8

two offices. Ellison testified to the procedure that was followed during a will's signing. First, the testator presented photo identification. The testator was then asked their "name, address[,]" and general questions pertaining to their competency such as, "Who's the president? What's going on in the world? Is the sky blue?" Ellison testified that Julie Patridge was the second witness, and Angela Canant notarized the signature on the will. Ellison positively identified her signature on the will. Ellison testified there was "no doubt [Janie] knew what she was doing [when she signed this will]." Ellison testified that the only individuals present at the will's execution (aside from herself) were Janie, Janie's attorney, Partridge, and Canant. Janie's will was admitted as an exhibit.

¶17. Doris called Julie Partridge as a witness. Partridge testified she worked for the same CPA firm as Ellison. Like Ellison, Partridge was asked to witness the signing of Janie's will. Partridge positively identified her signature on the will. Partridge testified "we would just get called into the conference room and there would be people there doing the will. And they would just explain to us that we were the witnesses and to sign." She stated the only individuals present were herself, Janie, Janie's attorney, Ellison, and Canant. Partridge testified she did "not really" remember this specific will and was basing her response on customary procedure. Partridge testified there was never a time where she witnessed someone signing a will who did not know what they were doing.

¶18. Doris called Debra Williams, Janie's niece, to testify. Debra recalled first meeting Janie when she was "18" during one of Janie's Christmas visits. Debra testified that when Janie visited, she would talk to her "all the time." Debra stated Janie was "adventurous" and

would "always tell us her stories about . . . New York, places that she'd go, people that she met[.]" Debra "never heard" Janie talk about her estate. Debra described Janie as "very independent[,]" asserting "she wouldn't let us do anything for her because she wanted to do it herself." Even when Janie got sick, "she still didn't want [anyone] to help her." Ultimately, she "had to depend on other people to help her when she had her health issues going on." This help was only "physical" in nature.

¶19. Debra discussed a time where she traveled to New York with Doris, Ernest, Ernest's wife Elizabeth, and Inez to "pick [Janie] up" upon her being discharged from the hospital. Debra testified that Janie told her and Doris that she "wanted [them] to pack up for the move back to Mississippi." Debra and Doris "straightened up" Janie's room, "gathered" the "stuff" Janie directed them to pack, and put everything in a "storage room[,]" which Janie had rented. During this same visit, Janie "got sick," and her "rehab nurse . . . came to visit her and she wasn't doing good." An ambulance was called, and Janie was taken back to "rehab." Doris and Debra left New York after they finished putting Janie's things in "storage[.]" They did not bring Janie back to Mississippi on this trip.

¶20. Debra returned to New York alone one final time to "bring [Janie] back to Mississippi." She was alone on this trip. Upon her arrival, Debra went to the hospital and picked up Janie after her discharge. Once Janie was in the car with Debra, Janie asked Debra to make a "stop" at her bank. Debra went into the bank with her. Janie was "getting information from [the bank] that she needed so when she'd go to Mississippi, she'd have everything she [needed] to transfer her money into the bank that she was going to establish

10

in Mississippi." Debra testified Janie had already called Doris to tell her "what time [they were] coming in[.]" Debra testified that Doris was "like a daughter" to Janie and that they "did everything together." Debra testified that once Janie moved in with Doris, she helped her "get straightene[d] out at Doris's house" and would "call her . . . to check on her."[11] Janie was "taking care of her own affairs" and never indicated to Debra that she needed anything.

¶21.    Doris testified next and said Janie "visited [Doris] every time she came [to Jackson]." Janie would "spend the day" with Doris's mother and "spend the night" with Doris. Once Janie got sick and was hospitalized in New York, Doris started "talking with the social workers back and forth trying to create a plan of where [Janie] would go when she got discharged." Doris and Debra were going to follow Ernest, Elizabeth, and Inez, but "they had already taken off and gone." Doris called Janie, who said she "need[ed]" Doris and Debra to come and to "get the car and . . . come on." Doris and Debra drove to New York. When Debra encountered Inez and Ernest at Janie's house, "nobody said anything to anybody[.]"

¶22.    Janie moved back to Mississippi around "January of 2013." Doris testified Janie had "a lot of problems" with her health. She was capable of carrying "her [oxygen] tank and her purse[,]" but that was all "she would carry." Doris testified that she brought Janie to open a new bank account in Mississippi upon her initial arrival. Doris accompanied Janie inside the office, but Janie "set the account up" without Doris providing Janie any advice because

---

[11] Debra was living in Georgia during this time.

11

Janie "knew how to do all of it." Janie named Doris as a co-owner of this bank account. When asked why she was on the account, Doris responded, "If she got sick, she still had bills to pay[.]" Shortly after her arrival in Mississippi, Janie was admitted to the hospital.

¶23. Around "four or five weeks" after Janie was initially admitted to the hospital, Janie decided to execute her will. Doris testified that at this point, "[Janie] was up and about and doing her own thing." However, Janie "didn't drive[,]" so Doris and Melvin drove Janie anywhere she needed to go. Doris stated she and Melvin drove Janie to the attorney's office on the date of the will's execution. Doris recalled taking her to this same lawyer's office on one other occasion to "pick up some paperwork." On the day she executed her will, Doris and Melvin drove Janie to the attorney's office but did not know what she was doing. Doris testified that after Janie had executed her will, "she had an envelope" but did not tell Doris what was in the envelope. Janie told Doris she was going to "talk to [Doris] later on about [the envelope]." At the same meeting where the will was signed, Janie also effectuated a document that gave Doris medical power of attorney over Janie.

¶24. Doris stated she discovered the will, which devised and bequeathed all of Janie's assets to her, "some weeks after she had left [the attorney's] office." Janie handed Doris "an envelope" and told her to "keep that envelope and the statements from [Vanguard]." Doris opened that envelope prior to Janie's death. She recalled asking Janie, "[W]hy did you do that?" She also told Janie, "[N]ow they're really going to be mad at me." Janie told Doris she "didn't care" and that she "wanted [Doris] to have it." She proceeded to ask Doris if she

12

"could handle the pressure that was going to come from them[,]" and Doris responded, "I can handle it."

¶25. Doris testified that before Janie's death, Janie had two separate retirement accounts. The first, a Roth IRA that named Doris and her daughter Toni Bryant as the primary and secondary beneficiaries. The beneficiaries of this account never changed. After Janie's death, the proceeds of this account were paid to Doris.

¶26. Doris testified Janie also had a traditional IRA. Before August 2010, Janie had listed Irene as the primary beneficiary of this account, with Inell Williams as the secondary beneficiary.[12] In August 2010, Janie changed the primary beneficiary to Sharon Williams.[13] In August 2011, Janie changed the primary beneficiary from Sharon to Irene. In August 2013, Janie designated Doris and Toni as the primary and secondary beneficiaries. Doris indicated that she did not influence the change designating her as the primary beneficiary. In February 2013, Janie had changed the primary and secondary beneficiaries to Debra and Ernest, respectively. This change, Debra testified, "roughly correspond[ed] with her first being admitted to the emergency room[.]" Doris stated it was at this time Janie had expressed a desire to "get her affairs in order." Finally, in May 2013, Janie changed the primary and secondary beneficiaries of this account to Doris and Toni, respectively. Doris testified she was not involved in any of Janie's correspondence with Vanguard when she made these changes and assumed Janie "handled it on the phone." The total value of these

---

[12] Inell's relation to Janie is unclear from the record. She is mentioned only in Doris's testimony during discussion of the Vanguard accounts.

[13] Sharon is Doris's eldest sister and Janie's niece.

accounts "on June 30 of 2015 was . . . $268,069.76[.]" After Janie's death, the IRA was "paid over" to Doris.

¶27.    Finally, Doris testified that Janie never told her why she devised everything to Doris instead of the other family members. Doris maintained her house "was always open to whoever wanted to come and see [Janie]." She recalled Ernest and his wife came to see Janie "one time[.]" Inez "never came." Doris further stated "they never called" to ask if Janie could be dropped off to visit at their homes or offered to come pick her up.

¶28.    Irene's attorney called Inez to testify, and Inez said she and Janie "didn't fall out"; Inez "talked to [Janie] every morning before she went into the hospital." Inez further testified she and Doris used to be "good friends," but Doris "changed" when Janie moved in with her. Inez stated Janie told her Inez was listed as a beneficiary on her Vanguard accounts "more than once."

¶29.    On the second day of the hearing  Janie's brother Ernest Williams testified. Ernest testified he visited Janie when she was first hospitalized in Mississippi. He recalled how he "talked to [Janie] one time over the phone, and she told [Ernest] that she was leaving [him] something. And she wanted [Ernest] and Doris to split it up with the other family if [they] wanted to." He stated that this conversation happened "about 12 years ago" but that Janie had not expressed anything to him about her estate since then.

¶30.    Doris was then re-called to the witness stand. During this testimony, Doris was asked about the will's execution. Doris clarified that after Janie was discharged from the hospital in February 2013, Janie told her she "wanted to get her affairs in order and she wanted an

14

attorney." Doris went through the phone book and found a name that "Melvin recognized" because that "attorney represented his mom and dad." Doris called the attorney's office and was told that he was "no longer there" and was recommended an alternative attorney in that office. Doris testified she had never previously met this attorney. According to Doris, there was "no connection" at all. Doris and Melvin drove Janie to her meetings with her attorney but "did not" attend any of these meetings with her. When Janie left this meeting, she told Doris she was "trying to make some preparations" but did not tell her "anything." Doris and Melvin drove Janie to a second meeting at her attorney's office. Neither Doris nor Melvin went into that meeting with Janie. Doris testified Janie "never said anything about her plans" after that second meeting. Doris eventually got a copy of the will because Janie "gave [Doris] a copy of the will and she told [Doris] to hold onto it[,]" but Doris did not "open it up right away[.]" Doris testified she "did not" give Janie any advice or influence her in any way.

¶31. Doris further testified that Janie paid all her own bills through her "Social Security," which was "directly deposited into her checking account." Janie continued paying her own bills until she went to the hospital for the last time. Doris had to pay Janie's credit card bill "twice." When Janie passed away, Doris "didn't call" Janie's sisters or brother to inform them.

¶32. Doris's "lifetime partner" Melvin Gray testified next. He said he first met Janie "16 years ago" when she came to Doris's house to visit. Melvin stated Janie was "one of the sharpest" individuals he had "ever seen." Melvin stated Janie "could drive if she wanted to,

15

but she chose not to." He further testified when he would take her to "the bank[,]" he "never went in with her." Melvin recalled he would "take her to Walmart" and "sit out there in [his car]." Melvin stated, "[Janie] did what [Janie] wanted to do." Melvin testified Janie never asked him to drive her to see any of her sisters or her brother.

¶33. When asked how Janie retained her lawyer to prepare her will, Melvin stated he "told Doris to look in the phone book" and find the name of an attorney who had assisted his parents. When Doris "called up there and asked for [that attorney,]" he was "no longer there." Melvin explained, "[T]hat's how we set up an appointment" with the attorney Janie ultimately hired. Melvin testified he had never previously met or heard of this attorney. Melvin and Doris drove Janie to her meetings at the attorney's office. Melvin and Doris entered the office with Janie and were "introduced" to the attorney, but they did not attend the meeting between Janie and her attorney. Melvin recalled he and Doris drove Janie back to that office a second time but stayed "outside" while Janie went inside. After that meeting, Janie said "nothing" about what she had done.

¶34. Doris's counsel also called Keith Partridge, a "good family friend" of Doris and Melvin. He testified he "knew" Janie and observed she was "sharp" and "[d]idn't appear to" be dependent on Doris in her daily life. Keith personally observed Melvin's and Doris's interactions with Janie and testified that they "certainly" had a good relationship, and he "never witnessed any coercion or anything."

¶35. Sharon Williams, Doris's oldest sister, also testified. Sharon recalled seeing Janie "every time she visited [Mississippi]." Sharon testified that Janie "never drove when she

16

came home [to Mississippi]." Sharon testified she was never concerned that Doris or Melvin was influencing Janie. Janie "wasn't the type that was easily influenced by anybody . . . when she made her mind up about something, it basically was made up."

¶36. Finally, Sharon testified about a time where Inez wanted something from Janie that Janie "refused to give her. So [Inez] . . . sent all the gifts back in a garbage bag that [Janie] gave her." She remembered Janie being upset about this. This incident occurred prior to Janie moving in with Doris, when Janie was "still living in New York." Sharon never saw Janie and Inez "patch" the relationship after this, but she noted that Janie was not "the type to hold grudges."

¶37. Doris called Earnest D. Williams, Doris's brother.[14] Earnest interacted with Janie "monthly" as his "youngest daughter" had a "close" relationship. Earnest testified he observed Janie to be "capable of managing all of her own affairs[.]" He further testified that he observed Melvin and Janie's personal relationship and described it as "like family." Irene called Ernest Williams, Janie's brother, who testified that he and Melvin got into an altercation in Janie's hospital room. Then Irene called Inez back to the witness stand a third time to testify further about the incident at the hospital. She further testified that she did not go to Janie's funeral because she found out about it "the night before."

¶38. On April 6, 2021, the chancellor entered her "Opinion and Order," finding the Last Will and Testament of Janie Williams valid. Considering the factors set forth in *Kimbrough v. Estate of Kimbrough*, 124 So. 3d 281, 284 (¶12) (Miss. 2014), the chancery court found

---

[14] Not to be confused with Ernest Williams, Janie's brother.

that a confidential relationship existed between Janie and Doris. However, the court determined "the conduct [did] not rise to the level of undue influence to shift the burden of proof to Doris to rebut." Nevertheless, even though the court found the burden of proof did not shift, the court stated that "[b]ecause the [c]ourt has already found that a confidential relationship exist[ed], the following factors shall be considered: (1) whether the beneficiary acted in good faith; (2) whether the testator had full knowledge and deliberation in executing the will in question; and (3) whether the testator exhibited independent consent and action." After considering these factors, the court found that "other members had independently become estranged from" Janie and Doris "exercised good faith in the care and the relationship with" Janie.

¶39. On April 16, 2021, Williams filed a "Motion for Rehearing . . . pursuant to [Mississippi Rule of Civil Procedure] 59 . . . ." While the motion was pending, on June 20, 2022, Williams filed a notice of appeal.[15] A hearing on the motion was held on August 29, 2022.

¶40. On September 23, 2022, the court entered an "Amended Opinion and Order" and granted Williams's Rule 59 motion and determined that "additional analysis of the facts and law is warranted." Accordingly, the court held that the previous order "shall be vacated and

---

[15] Irene filed a notice of appeal in this case on June 20, 2022, after the April 6, 2021 order was entered and after the "Motion for Rehearing" was filed. The notice of appeal was filed before the chancery court ruled on that outstanding motion filed pursuant to Mississippi Rule of Civil Procedure 59. *See* M.R.C.P. 59 advisory committee notes (discussing mislabeled but timely motions). Mississippi Rule of Appellate Procedure 4(d) indicates a notice of appeal filed before "disposition of any of the above motions" is ineffective "until the entry of the order disposing of the last such motion outstanding." Rule 59 is listed as one such motion. *See* M.R.A.P 4(d).

substituted[.]"  The court emphasized that "[t]he existence of a confidential relationship, standing alone, does not give rise to a presumption of undue influence," citing *Kimbrough*, 134 So. 3d at 285 (¶13).  The court found that there was "no evidence of . . . abuse or that [Janie] was over-mastered or controlled by either Doris or Melvin in the procurement or execution of her will."  Notwithstanding this finding, the court ordered the following:

> [T]he Court will continue its analysis assuming that the remote relationship between Melvin and the drafting attorney, along with merely driving Aunt Janie to the lawyer's office, is sufficient to satisfy the element of being actively involved in the preparation and execution of the purported will, thereby creating the presumption of undue influence.

The court further found that Doris "presented clear and convincing evidence of her good faith," as well as Janie's "full knowledge and deliberation of her assets and the provisions of her will," and Janie's "independent consent and action in securing her will."  Last, the court found that "other family members had independently become estranged from" Janie as they did "not attend her funeral."

¶41.    Irene now appeals arguing the chancellor erred  because Doris was actively involved in the execution of Janie's will, and suspicious circumstances surrounded the will's execution that were sufficient to raise a presumption of undue influence.  Irene further argues that given this presumption, the burden shifted to Doris to prove good faith and that Doris failed to meet this burden.

**STANDARD OF REVIEW**

¶42.    "[W]hen reviewing a chancellor's legal findings, particularly involving the interpretation or construction of a will, this Court will apply a de novo standard of review."

19

*Last Will and Testament of Carney*, 758 So. 2d 1017, 1019 (¶8) (Miss. 2000) (quoting *In re Est. of Homburg*, 697 So. 2d 1154, 1157 (Miss. 1997)). A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009). We will not reverse a chancellor's findings when they are supported by substantial credible evidence in the record. *In re Estate of Grantham*, 609 So. 2d 1220, 1223 (Miss. 1992).

## ANALYSIS

¶43. "The basic legal principles applicable to will contests and claims of undue influence are well-settled." *In re Est. of Rogers*, 270 So. 3d 1, 11 (¶37) (Miss. Ct. App. 2018). "The proponent of a contested will bears the burden of proving its validity in all respects. *Id.* (citing *In re Est. of Pigg*, 877 So. 2d 406, 409 (¶8) (Miss. Ct. App. 2003)). "A prima facie case of validity is made when the will and its record of probate are admitted into evidence." *Id.* Then the burden of production shifts to the contestant, who "bear[s] the burden of going forward with evidence to challenge the will's validity." *Id.* at 12 (¶37).

¶44. The contestant of the probated will has the burden of establishing the existence of a confidential relationship between the testator and the beneficiary. *Norris v. Norris*, 498 So. 2d 809, 813 (Miss. 1986). Thus, "where a confidential relation exists between a testator and a beneficiary under his will, *and the beneficiary has been actively concerned in some way with the preparation or execution of it*, the law raises a presumption that the beneficiary has exercised undue influence over the testator, and casts upon the beneficiary the burden of disproving undue influence by clear and convincing evidence." *Croft v. Alder*, 237 Miss.

20

713, 722-23, 115 So. 2d 683, 686 (1959) (emphasis added). "The Supreme Court has also stated that the presumption of undue influence arises if the contestant proves a confidential relationship and suspicious circumstances in the execution of a [w]ill." *Davion v. Williams*, 352 So. 2d 804, 805 (Miss. 1977). "Thus, if the contestant proves both (a) a confidential relationship and (b) the beneficiary's active involvement in the preparation or execution of the will or other "suspicious circumstances" in the execution of the will, the presumption of undue influence arises. *See* Robert A. Weems, *Wills and Administration of Estates in Mississippi* § 8:18 (3d ed. 2003).

¶45. "A presumption of undue influence is not raised merely because a beneficiary occupies a confidential relationship with the testator; something more is required, such as active participation by the beneficiary in the procurement, preparation or execution of the will or mental infirmity of the testator." *Est. of Sandlin v. Sandlin*, 790 So. 2d 850, 854 (¶9) (Miss. Ct. App. 2001). The existence of a confidential relationship, standing alone, does not give rise to a presumption of undue influence. *In re Will of Adams*, 529 So. 2d 611, 615 (Miss.1988). For testamentary gifts, "[i]f it is determined that a confidential relationship exists, an abuse of that relationship must be shown for the [c]ontestants to raise a proper presumption of undue influence." *Gray v. Est. of Kimbrough,* 134 So. 3d 281, 285 (¶13) (Miss. 2014) (citing *Costello v. Hall,* 506 So. 2d 293, 298 (Miss. 1987)). "[E]ven when a confidential relationship can be said to exist between the parties, . . . the beneficiary under the will must have used that relationship for his personal gain or to thwart the intent of [the] testator." *Costello*, 506 So. 2d at 298.

21

¶46. Once established, the burden of proof shifts to the beneficiary to demonstrate by clear and convincing evidence, that the will is not the product of undue influence. *Est. of Dabney*, 740 So. 2d 915, 921 (¶19) (citing *Croft*, 115 So. 2d at 686). The Supreme Court has adopted a three-part test for determining whether the beneficiary of a will has overcome a presumption of undue influence in *Mullins v. Ratcliff*, 515 So. 2d 1183 (Miss. 1987). Under this test, the presumption is overcome if the "proponent of the will . . . show[s] (1) good faith on the part of the beneficiary, (2) the testator's full knowledge and deliberation of the consequences of his actions, and (3) that the testator received the advice of a competent person disconnected from the beneficiary." *Sandlin*, 790 So. 2d at 853 (¶10) (citing *Est. of Dabney*, 740 So. 2d 915, 921 (¶19)). The third prong of this test was redefined as "independent consent and action" by the testator. *Mullins*, 515 So. 2d at 1194.[16]

¶47. Here, as stated previously, the chancery court found that a confidential relationship did exist between Janie and Doris. Neither party is contesting that finding on this appeal. The chancery court went further to hold that there was no "abuse" of this confidential relationship or that Doris "over-mastered or controlled" Janie in the "procurement or execution" of the will. The chancellor concluded that there was no evidence that Doris "abused the relationship either by asserting dominance over the testator or by substituting her intent for that of the [testator]." This is the issue Irene raises on appeal.

---

[16] The chancellor discussed each of the factors to rebut the presumption of undue influence as set out in *Mullins*. Because there was substantial evidence to support the chancellor's finding that there was no "abuse" or "suspicious circumstances" surrounding the execution of the will, it is not necessary for this Court to address the factors rebutting the presumption of undue influence.

¶48. Irene contends that "Doris and Melvin assisted with finding Janie an attorney and drove her to meetings with the attorney" and that this constituted their "direct[] involve[ment] in procuring the [will]." Here, the chancellor found there was "insufficient evidence in the record to suggest that [Doris], or Melvin Gray for that matter, were actively involved in the preparation or execution of [Janie's] will." On these grounds, the court determined, " the conduct [did] not rise to the level of undue influence to shift the burden of proof to Doris to rebut."

¶49. The proof as to "active involvement" by Doris or Melvin was twofold. One, they drove her to the office of the lawyer who prepared the will. Two, the lawyer who had once assisted Melvin's family recommended another lawyer when Janie called. To be clear, it was the referred lawyer who prepared the will at issue. However, it is undisputed in the record, that neither Melvin nor Doris had ever used this particular lawyer and, in fact, had never heard of this lawyer. Further, neither Doris nor Melvin knew Janie was going to the office to execute a will. Also, neither Doris nor Melvin went into the meeting between Janie and the lawyer and only learned several weeks later that the document Janie left the office with was a will. The act of Melvin telling Janie to call a lawyer who one of his family members had used in the past and then that law firm referring Janie to another lawyer who Melvin and Doris did not know or had never used, can hardly constitute active involvement which would raise the presumption of undue influence. This Court has held that "without more, [a] simple act of recommending an attorney is not the sort of active involvement in the preparation of a will that will raise a presumption of influence." *In re Est. of Rogers*, 270 So. 3d at 13-14

(¶44).  The Mississippi Supreme Court has held that driving the testator to the attorney's office is "not enough to prove a presumption of undue influence." *In re Est. of Hitt v. Hart*, 338 So. 3d 681, 689 (¶33) (Miss. 2022) (citing *Chapman v. Chapman* (*In re Est. of Chapman*), 966 So. 2d 1262, 1265 (¶17) (Miss. Ct. App. 2007) (finding no presumption of undue influence when wife's "only action[s] involving the will were traveling with [her husband] to his attorney's office and possibly discussing it with [him]")).  Furthermore, the undisputed testimony indicates Melvin and Doris drove Janie everywhere she went because she "chose" not to drive.  In fact, it is clear that Janie chose not to drive herself even before her move from New York to Mississippi.  It is not unusual that Melvin and Doris drove her to her meeting with her attorney on the day it was executed just as they drove her to the grocery store, bank, or anywhere else Janie wanted to go.  *See In re Last Will and Testament of Kistler*, 22 So. 3d 1209, 1215 (¶16) (Miss. Ct. App. 2009) (finding no evidence of participation in the execution or preparation of testator's will where the beneficiaries drove testator to the attorney because this was not unusual as the testator "did not drive" and the beneficiaries "drove her everywhere").

¶50.    Irene also argued that other "suspicious circumstances" existed that the chancellor should have found justified the presumption of undue influence.  For example, Irene argued, "Doris sought to secret Janie's Last Will from the rest of her siblings."  Further, Janie executed the will "as little as two months . . . [after] Janie moved in with Doris[.]"  In addition, Irene claimed that Doris "interfered" with Irene and Inez's[17] relationships with

---

[17]  Inez is often referred to as "Ined" in Irene's brief.

Janie, as Irene and Inez did "not feel welcome at Doris['s] home." To reiterate, "[the] presumption of undue influence [arises if the contestant proves] a confidential relationship and suspicious circumstance[s] in the execution of a [w]ill." *Davion*, 352 So. 2d at 805.

¶51. Here, there was nothing "suspicious" about the will's preparation or execution that would rise to the legal level of creating a presumption of undue influence. *In re Est. of Rogers*, 270 So. 3d at 44 (¶14) (citing *Davion*, 352 So. 2d at 805; *see* Weems, *supra*, § 8:18 (noting that the term "suspicious circumstances" is "obviously vague" if applied to conduct other than a beneficiar's "activity in preparing or executing the will"). During the will's execution, two witnesses testified that Janie appeared to be of sound and disposing mind and that Janie had denied being subject to any influence. The testimony was unanimous from all witnesses as to Janie's mental competency. She was described by various witnesses as "independent," "sharp" and not "the type that was easily influenced by anybody." Further, Doris testified she did not know the contents of the will until after Janie had left the lawyer's office several weeks later. Doris recalled that shortly after Janie had executed the will, Janie asked Doris if she could "handle" it, referring to the affect the will may have on family.

¶52. "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this [C]ourt may not intercede simply to substitute our collective opinion for that of the chancellor." *Chaney v. Chaney (In re Est. of Chaney)*, 235 So. 3d 120, 122 (¶7) (Miss. Ct. App. 2017) (quoting *Hinders v. Hinders*, 828 So. 2d 1235, 1244 (¶28) (Miss. 2002)). After considering all the aforementioned testimony, we find that substantial evidence supported the chancellor's

findings that there was no abuse or suspicious circumstances that would have given rise to a presumption of undue influence.

## CONCLUSION

¶53.   The chancellor's determination that Doris had a confidential relationship with Janie appears clearly manifested in the record.   Further, the record supports the chancellor's determination that there was no abuse or suspicious circumstances surrounding that confidential relationship or Doris's active involvement in the procurement or execution of Janie's will that would have created a presumption of undue influence.   Accordingly, we affirm the chancery court's Amended Opinion and Order.

¶54.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**